UNITED STATES of America ex rel. James NICKENS, Petitioner,

v.

Hon. J. E. LaVALLEE, as Warden of Auburn State Prison, Auburn, New York, Respondent.

No. 66 Civ. 4520.

United States District Court
S. D. New York.

Sept. 14, 1967.

Anthony F. Marra, New York City, for petitioner; Joshua N. Koplovitz, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of State of New York, New York City, for respondent; John G. Proudfit, Asst. Atty. Gen., of counsel.

MEMORANDUM

THOMAS F. MURPHY, District Judge.

The Court of Appeals by order dated December 7, 1966, remanded this writ for an evidentiary hearing on the issue of illegal search and seizure. It appeared on our calendar in Part I on August 21st and we held the hearing on August 30, 1967.

Although relator's counsel called Detective McDonnell, the arresting officer, as his first witness and reviewed with him the pertinent events of March 11, 1962, he specifically disclaimed any objection to the arrest without a warrant but based his claim for invasion of the relator's constitutional rights on the searches and seizures that were made after the relator was arrested and brought to the 4th Precinct Station House. Since, however, the preliminary events have a distinct bearing on these subsequent events, a recitation and findings relative thereto are necessary.

Preliminarily, it should be stated that the relator on the day of the hearing, August 30, 1967, was not in the physical custody of the respondent, having been released from prison on June 14, 1967, and placed on parole which will expire in March, 1968. No question has been raised as to the jurisdiction of the court, both sides agreeing that Jones v. Cunn-

ingham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) controls.

Detective McDonnell testified that while on duty in the early morning of March 11, 1962, he noticed a New York City Police Department radio car with no occupants, but with both doors opened, parked on Church Street near Chambers Street in the Borough of Manhattan. After talking to the two radio car patrolmen, he walked to an empty store which was under renovation, in front of which was a sealed carton that was leaking liquor. While peering in the door to this store, it opened from the pressure of his body and he noticed a large canvas covering the north wall. Entering the store, he pulled aside this canvas and found a hole in the wall leading into a bar and grill known as the Blarney Castle Bar. He told the patrolmen to report his presence to his precinct and also directed that the owner be notified and directed to come to the premises. Returning to the street, he tried both the Chambers Street and the Church Street entrances to the bar but found them locked. Then noticing a light in an office above the bar, he went to the entrance of that building #149 Church Street. Although the door was closed, it was not locked and he went into the lobby with one patrolman. He noticed that the elevator indicator pointed to the second floor and thereupon rang for the elevator which he and Patrolman Williams then took to the second floor. He stated that prior to entering the elevator he detected a strong odor of liquor in the lobby.

Locating the lighted office, they found the door ajar and saw a man lying on the floor. They entered and McDonnell attempted to arouse this person (later identified as the relator) by kicking the soles of his feet. He and Patrolman Williams then helped relator to his feet. McDonnell stated that it was his opinion that Nickens was drunk. He testified that while in the office he noticed an adjoining room in which he saw a large amount of key making equipment, blank keys, used locks and lock picks. Upon questioning the relator, McDonnell learned that he was the superintendent of the building and that these were his offices.

Thereupon the relator accompanied McDonnell and Williams downstairs to the vacant store, at which time McDonnell noticed that the tarpaulin covering the hole in the wall had been moved aside. Through this hole McDonnell saw Conlon, the owner of the bar, and several officers. Conlon stated that approximately 40 cases of liquor were missing from the stock room. Conlon also identified the relator as being the superintendent of the building and stated that he was a good reliable man.

McDonnell then accompanied Conlon to his stock room in the basement of the bar where he noticed a ripple soled shoe print in the dust on the floor. He further testified that there was a similar print on a piece of yellow paper lying on the floor. At that point he recalled that the relator had been wearing ripple soled shoes. Returning to #149 Church Street, he found the door locked but he was able to enter the building by means of a key produced by Conlon. He then proceeded to the fifth floor where he climbed a stairway to the roof and found Nickens going over to the roof of the adjoining building. After Nickens stated that he was looking for burglars, McDonnell suggested that they search the building together. Relator agreed and they proceeded to the fifth floor. There McDonnell noticed a damp spot and pieces of glass near room 510 and after relator denied having a key to this room, McDonnell suggested that they go to relator's office, where he remembered seeing a board with keys on it. There McDonnell found a key marked "510" and he and relator again returned to the fifth floor.

McDonnell testified that upon opening room 510, he found about 70 cases of liquor, a broom dripping with what appeared to be alcohol, a broken bottle and a dolly containing three or four cases of liquor. After some conversation with the relator, Nickens allegedly said,

"So, I did it—prove it." Subsequently, while on their way down in the elevator, McDonnell stated that a key marked "510" dropped from the relator's glove, whereupon he placed him under arrest. They then went to the second floor office where McDonnell found another key marked "bar" in a glove discarded by the relator.

McDonnell further testified that after taking Nickens to the station house, he returned to the office and seized various key making tools, a note book, a can with keys labeled with various New York addresses and a piece of modelling clay. After having his recollection refreshed, McDonnell recalled that it was not until this time that he first searched the office.

With these items in custody, McDonnell returned to the station house where he asked the relator to turn over his shoes so that they could be preserved as evidence. Then, according to McDonnell, the relator asked that he be taken to his apartment on West 138th Street in order to obtain another pair of orthopedic shoes. McDonnell accompanied him there and although he did not enter the apartment he did see therein a large quantity of key making equipment which was subsequently seized pursuant to a search warrant. Certain newspaper clippings used in the cross-examination of relator during his trial were also seized, although unauthorized by the warrant. McDonnell claims that some of the key making tools were wrapped in these papers.

The relator's testimony at the hearing was brief. His testimony contradicted McDonnell's in that he stated the detectives entered his apartment when he was taken there to get his shoes. He further testified that the above-mentioned clippings were in a small, round cake box and were not wrapped about any tools.

It is undisputed that the tin can containing keys with tags denoting New York City addresses (People's Exhibit 16), the piece of modelling clay (People's Exhibit 23) and the notebook (People's Exhibit 24) were all taken by Detective McDonnell after he had booked the prisoner at the station house.

■ The Attorney General impliedly concedes the illegality of the seizure of the notebook but argues that the other items were visible prior to the arrest and, therefore, can be considered as the fruits of a reasonable search incidental to the arrest and as part of a continuing act. But we find as a fact that Detective McDonnell did not see or notice these items until he had made a thorough search after booking the prisoner and thus the seizure cannot be considered either reasonable or incidental to the arrest or as part of a continuing act. See Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

■ The other items complained of are the newspaper clippings seized in the relator's home while a search warrant was being executed. We do not accept Detective McDonnell's testimony that these were wrapped around the key making tools. A mere examination of them convinces us to the contrary. They were not put in evidence by the People but were used in cross-examining the defendant. Although they were not any of the items described in the search warrant, they were obtained by Detective McDonnell in the course of a lawful search and thus legally seized, as we read Abel v. United States, 362 U.S. 217, 238, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). See Warden v. Hayden, 387 U.S. 294, 300–310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In *Abel*, the court in considering the legality of the seizure of a piece of graph paper stated that "it would be entirely without reason to say that he [the officer] must return it because it was not one of the things that it was his business to look for." 362 U.S. at 238, 80 S.Ct. at 697.

■ However, since the warrantless seizures made after the arrest and booking of the defendant were unreasonable and since we are not able to say that we

have a belief that the reception of the seized items was harmless beyond a reasonable doubt, Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we are satisfied that the relator's constitutional rights have been violated and the writ should be sustained.

Unless the People are willing to grant the petitioner a new trial and unless such a decision is forthcoming within 30 days, the relator is discharged from parole.

This is an order. No settlement is necessary.