STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
BENTLEY ANDREW DYE, DEFENDANT-APPELLANT.

Argued January 25, 1972—Decided June 5, 1972.

*Mr. William J. Rohr,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. John A. Brogan,* Deputy Attorney General, argued the cause for respondent (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. Defendant Dye was convicted of bookmaking. The evidence from which the conviction resulted arose primarily from a wiretap of a telephone on the premises where Dye was employed. At the trial he challenged the admissibility of the wiretap product alleging that it was obtained in violation of the New Jersey Wiretapping & Electronic Surveillance Act, *N. J. S. A.* 2A:156A–1 *et seq.,* and of the Fourth Amendment of the United States Constitution. After sentence an appeal was taken to the Appellate Division, which we certified prior to argument there.

## I

For some years prior to April 1969 Dye was an employee of the Middlebrook Lounge which operated a restaurant, bar and liquor store on U. S. Highway 22, Bridgewater Township, Somerset County, New Jersey. His working hours were from 8 A.M. to 4:30 P.M. A public pay telephone was located on the east wall of the liquor sales portion of the premises. It was this phone which was tapped pursuant to an order of the Superior Court, granted on sworn application of two detectives of the Somerset County Prosecutor's Office, who sought the order upon the written authorization of the prosecutor.

The supporting affidavit of Lieutenant Detective Karkowski of the Somerset County Prosecutor's Office asserted that he had been charged with conducting gambling investigations for nine years, and had qualified as an expert witness in such matters in Somerset County courts on 16 occasions.

On November 15, 1968 he had been advised by Lieutenant Silvio Donatelli of the Middlesex County Prosecutor's Office that he (Donatelli) had good reason to believe a location in Middlesex County was being used for bookmaking purposes. He advised also that investigation revealed telephone toll records showing calls placed from the suspect location to telephone number 725-9743. On checking this number Karkowski found it to be listed for the Middlebrook Liquor Store, 966 U. S. Highway 22, Bridgewater Township. Further investigation at that time was non-productive.

On February 24, 1969 Karkowski was in the Somerset Diner, in North Plainfield, at about 10:30 A.M. While waiting to use the public telephone there (the location of which he described), he saw an unknown male use the telephone. The caller dialed Operator, asked for 725-9743, and when connected said, "Is Bentley there?" After a pause the caller said, "Paul, Bentley. Can you get some in for me today?" Following another pause, the conversation continued, and the

caller placed several bets on horses racing that day at Hialeah in Florida. After a pause, the caller said, "O. K., Bentley, see you later," and then returned to the dining area. Shortly thereafter, Karkowski looked over the dining area but could not locate the caller. A check of the Newark Star-Ledger that day revealed that the horses mentioned by the caller were scheduled to run that afternoon at Hialeah. Karkowski then rechecked the telephone number and found it listed as set forth above. He learned also the one employee of the liquor store was named Bentley Dye.

Pursuing this lead further, Karkowski instructed a confidential and reliable source of information, who had participated in other gambling investigations, to attempt to place bets with Dye. Subsequently, the informant reported he had been unsuccessful, adding his feeling that Dye would not accept bets from strangers.

Karkowski then requested Detective James Hoffman of his office to assist in the investigation. On April 15, 1969 Hoffman went to the Middlebrook Liquor Store, posing as a fisherman. He saw Dye make frequent references to the Morning Telegraph and the sports pages of the Daily News. At times while doing so Dye looked at notations on a slip of white paper which he took from his shirt pocket. In addition Dye had some guarded conversations with customers and Anthony Esposito, the owner of the establishment, after Esposito appeared to have looked over the horse racing pages of the Daily News. Around 11:45 A.M. Dye went to the liquor store portion of the premises and Hoffman entered the men's room near the wall public telephone. Hoffman heard a coin drop and the dial used, following which he heard Dye recite at least 10 horse race bets on an entry in the eighth race at Gulfstream. Hoffman reentered the liquor store and, while Dye was still on the telephone, made use of the cigarette machine there. At that time he noticd Dye consult a piece of white paper taken from his shirt pocket.

Karkowski in his affidavit expressed his belief that Dye was engaged in bookmaking and would continue to use the telephone at Middlebrook for that purpose between the hours of 10 A.M. and 3 P.M. daily, Monday to Saturday, inclusive. He said also that there was a special need for interception of these telephone conversations because the telephone being a public as well as the private business phone of the Middlebrook Liquor Store, no toll records were maintained, and normal investigations were not being and probably would not be sufficiently productive. He, therefore, expressed the opinion that interception was necessary for a period of time in order to establish the pattern of the bookmaking operation, and so as to aid in identification of the parties involved in the conspiracy to carry on the criminal activity.

Detective Hoffman joined in the affidavit to corroborate his described participation in the investigation. He was to install and maintain the electronic equipment. By way of qualification to engage in the wiretap, he swore he had undergone a week of specialized training in the use of such equipment and in the techniques required for its proper installation. The instruction had been given to him by a named expert in the field of telephone conversation interception.

After considering the affidavits, making the findings required by section 12 of the Act, *N. J. S. A.* 2A:156A–12 and incorporating them in the order, on April 29, 1969 the Law Division Judge authorized Hoffman to "intercept the wire communications of Bentley Dye relating to the offenses of Bookmaking and Conspiracy from telephone facility number 201-725-9743 listed to Middlebrook Liquor Store * * *" between the hours of 10 A.M. and 3 P.M. daily, Monday to Saturday, inclusive, for a period of 30 days. In accordance with section 12 the order directed that such "interception begin and end as soon as practicable, * * * and be conducted in such a way as to minimize or eliminate the interception of such communications other than the type described."

## II

Defendant has repeated certain objections made below to the order which may be considered at this point. He charges insufficiency of the supporting affidavits, alleging lack of sufficient "showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed \* \* \*" as required by *N. J. S. A.* 2A:156A–9(c)(6), 10(c). It is alleged also that since the telephone involved is a public facility the order is illegal because the affidavits failed to show a "special need" for the wiretap of a public phone as required by *N. J. S. A.* 2A:156A–11; and in any event there was no proof to warrant fixing the daily period of the interception as between 10 A.M. and 3 P.M. We agree with the trial court that these contentions lack merit.

The objections may be considered together. As noted above efforts by a reliable undercover agent to place bets with defendant over the telephone failed. The undercover surveillance engaged in by Detective Hoffman had only limited success, aside from providing some corroboration of the strong suspicion that Dye was engaged in bookmaking. Obviously, it was not practical to have an agent on the Middlebrook premises and near the public telephone hanging on a wall and straining to hear Dye's conversation every time he made or received a call. Moreover, assuming that enough had been heard to arrest Dye for gambling activity, the information which made that action possible was not sufficient to involve and identify his co-conspirators. Obviously, their apprehension was more important from the standpoint of law enforcement. The offense was a continuing one, and the telephone was playing an essential part in its success. In our view the facts contained in the affidavit sufficiently indicated that normal police investigative methods would not serve the purpose, and that there was a special need to tap the particular telephone, which was a partly public and partly private instrument. See, *State v. Christy*, 112 *N. J.*

*Super.* 48, 65 (Law Div. 1970). Accordingly, the Law Division judge properly exercised his discretion in granting the requested order.

■■ The criticism of the daily time period allowed for the tap, namely, between 10 A.M. and 3 P.M. except for Sundays, is likewise without merit. Lieutenant Karkowski qualified as an expert in gambling operations and it was his opinion that Dye's telephone calls relating to bets probably would be made daily between those hours. Additionally, the two very suspicious telephone calls referred to in the affidavit were made during that time interval. And it was clear that Dye probably would be on the premises between 10 A.M. and 3 P.M. As was pointed out in *State v. Christy, supra,* 112 *N. J. Super,* at 77–78, there is no express requirement in the statute that the hours of interception be specified in the order. The matter must rest in the reasonable discretion of the court. No abuse is discernible under the circumstances shown here.

Detective Hoffman's qualifications to execute the wiretap order are challenged. The statute conditions issuance of such an order upon a finding that the person authorized to execute the interception is qualified by training and experience to do so. *N. J. S. A.* 2A:156A–10(e). It was shown that Hoffman received a specialized one week training course from a named expert in the installation and operation of wiretapping equipment; also that he had been instructed in the procedures required by the New Jersey Wiretapping and Electronic Surveillance Act for the control of such an installation and the preservation of the fruits thereof. There is nothing in the record to demonstrate as a matter of law that his training did not sufficiently educate him to perform the task.

■■ Decision as to whether Hoffman was qualified to perform the wiretap was a matter for the discretion of the Law Division judge. An appellate court will not interfere with his resolution of the issue unless it was so clearly the result of an unreasonable evaluation of the facts as to con-

stitute a mistaken use of discretion. *Cf. Carbone v. Warburton*, 22 *N. J. Super.* 5, 14 (App. Div. 1952), aff'd 11 *N. J.* 418 (1953). We see no such mistake here.

### III

After the wiretap order was obtained, and the necessary arrangements made with the telephone company, Detective Hoffman installed what was described as the simplest and most direct form of tap on the Middlebrook Lounge pay telephone, designated 725-9743. A wire was then extended from the telephone pole in front of the Lounge across Route 22 into a room on the second floor of the Howard Johnson Restaurant, where it was connected to a tape recorder. An earpiece was attached to the recorder so that all incoming and outgoing calls could be heard and recorded. The sufficiency of the tap was tested and proved by dialing the Lounge number and carrying on a conversation with the person who answered there. Thereafter, beginning on April 30, 1969 and continuing until May 24, 1969 (the period covered by the bookmaking indictment), all incoming and outgoing calls occurring between 10 A.M. and 3 P.M., six days a week, excluding Sunday, were recorded. During that time Detective Hoffman remained at his listening post in the room. From his position he could observe the Lounge and he could see Dye much of the time. However, he could not see the tapped phone, so when Dye used it he was out of view. At times Hoffman was able to observe Dye walk in the direction of the phone and pass out of view, following which through the earpiece he could hear a coin deposited and a call made. Hoffman said he became familiar with Dye's voice and that of his employer, Esposito.

At the end of each day Hoffman made a "work copy" of the day's tapes. To do this, he recorded on another tape the portions of the original tape containing the damaging or incriminating and material conversations. He excluded all personal conversations, food orders, inquiries concerning liquor, and the like. Then a typewritten transcript was made

by a secretary (apparently in the prosecutor's office) of each daily "work copy." Thereafter Lieutenant Karkowski attached each "work copy" on a master reel which thereby reduced the total tap recording time from 105 hours on the original tapes to approximately 2½ hours on the master reel. When this was done, the original tapes were delivered to the judge who issued the wiretap order. They were sealed by him and at his direction placed in a safe in the prosecutor's office. *N. J. S. A.* 2A:156A–14.

About five months before the trial of the indictment for bookmaking, the defendant was provided with a transcript of the master reel tape containing all of the incriminating calls. This transcript was about 200 pages long, and obviously the intervening five months period allowed adequate time for study thereof in advance of trial. In addition, defendant's request for the Grand Jury testimony was granted.

At the trial the master reel, or recording of the daily "work copies" of the original tapes, was played for the jury and admitted in evidence. At the time of the offer, the prosecutor reminded the court that the original tapes had been available to the defense for months before the trial for purposes of comparison with the work copy but that no application had been made to examine or hear them. The trial court approved the time saving procedure, pointing out at the same time that defendant had the right, if he wished, to use the original tapes for purposes of cross-examination or to reread or to replay to the jury any portion thereof which was pertinent. Defense counsel did not pursue the matter. On defendant's motion for a new trial the prosecutor again represented to the court that "every single word" relating to the gambling charge in the indictment had been included on the work tapes, and that the original tapes were still under seal and available for inspection. The trial court allowed the reel and a recorder to be taken into the jury room for use during their deliberations, and a particular juror, who knew how to use the recorder, was named by the court to operate it.

■ The contents of the master reel left no doubt that Dye and his associates (not involved in this trial) were engaged in bookmaking. In fact, Dye did not testify, and no contention is made on this appeal that his guilt was not shown overwhelmingly.

At first when the State's witness put the recorder into operation, the sound was only partly satisfactory. Jurors, the court and counsel had difficulty in understanding it fully. Finally a recess was taken to provide an opportunity to remedy the condition. Upon resumption of the trial apparently the difficulty had been rectified because the recording proceeded to completion without further objection on that score. It should be noted here also that defense counsel at one point objected on the ground that listening to the tape which in its reduced fashion disclosed only conversations material to the bookmaking charge, the jury might get the impression that the telephone involved was used exclusively for bookmaking purposes. To eliminate any such possibility, the prosecutor made it plain to the court and jury that the tape represented a reduction of the number of phone conversations, and that what they would hear would be only the portions of the total conversations which the State claimed revealed the illegal activity for which Dye was being tried. The situation having been thus clarified, and the assurance given that the complete original tapes were sealed and in the prosecutor's safe, and available for check upon request, defendant interposed no further objection on that aspect of the proof.

Defendant argues that the work copy was inaudible and should not have been played before the jury. The claim cannot be sustained. As indicated above, the audio difficulty experienced on the original effort to use the recorder, seemed to have been overcome during the recess. Thereafter, the work tape was played to completion without further criticism by counsel, the court or the jury. We note also that when the post-trial motions to suppress the tapes (to be discussed hereafter) and to grant a new trial were made,

their alleged inaudibility was not urged as a ground. Moreover, there is no support in the record for the contention that all the tapes should be excluded either because they were entirely inaudible or inaudible in such substantial part as to render them untrustworthy. Unless such a condition appeared the State was entitled to have the tapes admitted in evidence. See *United States v. Knohl,* 379 *F.* 2d 427, 440 (2 Cir.), *cert.* den. 389 *U. S.* 973, 88 S. Ct. 472, 19 *L. Ed.* 2d 465 (1967); *Addison v. United States,* 317 *F.* 2d 808, 815 (5 Cir. 1963), *cert.* den. 376 *U. S.* 905, 84 S. Ct. 658, 11 *L. Ed.* 2d 605, reh. den. 376 *U. S.* 966, 84 S. Ct. 1121, 11 *L. Ed.* 2d 984 (1964); *Todisco v. United States,* 298 *F.* 2d 208 (9 Cir. 1961), *cert.* den. 368 *U. S.* 989, 82 S. Ct. 602, 7 *L. Ed.* 2d 527 (1962); *Cape v United States,* 283 *F.* 2d 430, 435 (9 Cir. 1960); and *Monroe v. United States,* 98 *U. S. App. D. C.* 228, 234 *F.* 2d 49, 55, *cert.* den. 352 *U. S.* 873, 77 S. Ct. 94, 1 *L. Ed.* 2d 76 (1956), where it was said "that partial inaudibility is no more valid reason for excluding recorded conversations than the failure of a personal witness to overhear all of a conversation should exclude his testimony as to those parts he did hear. Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge." See, also, *Cederbaums, "Wiretapping and Electronic Eavesdropping: The Law and Its Implications, A Comparative Study,"* 39. (*Criminal Law Education and Research Center, New York University School of Law,* 1969).

## IV

Error is claimed also because the trial court allowed the work copy tapes in evidence rather than requiring the State to put in all of the original tapes which recorded all of the conversations over the tapped phone during the indictment period. As the testimony shows the work copy

reel contained all of the conversations between April 30 and May 24, 1969 that were material and relevant as proof of the crime charged. It was explained under oath that at the end of each five-hour day these inculpatory conversations between Dye and his co-conspirators were culled from the full day's tape and put on the separate reel. The effect was to reduce 105 hours of listening by court and jury to about 2½ hours. There is no indication whatever that defendant suffered any prejudice from this operation, or that any conversation was altered or cut in any way which adversely affected defendant's interest. The full original tapes were sealed and secured by the court, and the prosecutor made it plain that he would consent to their study by defendant at any time. In addition, about five months before trial, defendant was given a copy of all the work copy tapes on which the State relied. Any question defendant might have had about their accuracy could have been settled by a request (to which the State agreed to consent), for leave to listen to the total tapes before trial.

In our judgment the course followed was a reasonable and practical one. It saved 102½ hours of tedious and wholly unnecessary reading at the trial. We see nothing in the wiretapping statute which bars such procedure. Although not dealing precisely with the situation before us, section 16 of the statute confers discretion on the court to make available to the subject of the wiretap "or his attorney for inspection such portions of the intercepted communications * * * [as it] determines to be in the interest of justice." *N. J. S. A.* 2A:156A–16. Also "any investigative or law enforcement officer who, by any means," has learned of the wire communications may disclose "such contents * * * to another investigative or law enforcement officer to the extent that such disclosure or use is appropriate to the proper performance of his official duties." *N. J. S. A.* 2A:156A–17(a). Further, when a "law enforcement officer, while engaged in intercepting wire" communications, in-

tercepts "communications relating to offenses *other* than those specified in the order of authorization, the contents * * * may be disclosed * * *" to and used by the appropriate law enforcement officer. *N. J. S. A.* 2A:156A–18. (Emphasis ours). And under section 21, when a motion to suppress the wiretap material is made in advance of trial, the court in its discretion may make available to defendant "for inspection such portions of the intercepted communication [as it deems] to be in the interests of justice." *N. J. S. A.* 2A:156A–21. These sections of the statute reveal a legislative intent to vest a broad discretion in the judge who issued the wiretap order to permit access to relevant portions of intercepted communications. Under the circumstances we hold that it was not improper to make a work product tape of the inculpatory conversations by the automatic and purely mechanical transfer thereto from the original tapes. The action obviously had the approval of the judge who issued the wiretap order since he allowed the prosecutor to give a copy of the reduced transcript to defense counsel. Approval of the trial court is indicated also because he recognized the practical need for avoiding the unnecessary burden of reading to the jury hour upon hour of conversations having nothing to do with the indictment being tried. To require such an over-technical and rigid application of the best evidence rule would serve only to hamper the inquiry and the trial without at all advancing the cause of truth. *United States v. Knohl, supra,* 379 F. 2d at 440. Furthermore, there is not the slightest indication that any material alterations or omissions occurred in the transposition. In fact defense counsel said on the motion for a new trial that he made no such accusation. For many months before trial defendant had a transcript of these tapes in his possession, knowing that they represented all of the inculpatory conversations on which the State intended to rely and did rely at the trial. But he neither objected thereto before trial nor applied for leave to com-

pare them with the originals. And as we have said, it is plain from the record that the prosecutor would have consented to such a comparison.

V

The ground of appeal stressed most vigorously is that Detective Hoffman in manning the wiretap operation failed to minimize or eliminate the interception of communications other than those of Bentley Dye "relative to the offenses of bookmaking and conspiracy." Specifically it is urged that since he recorded on tape all conversations over the suspect phone from April 30 to May 24, 1969, both section 12 of the statute, *N. J. S. A.* 2A:156A–12, and the court order permitting the interception were violated, thus requiring suppression of all of the tapes.

Section 12 undertakes to impose a degree of judicial supervision over a wiretap order. Among other things the order is required to describe "the type of the communication to be intercepted and [to contain] a statement of the particular offense to which it relates;" also to state "the period of time during which such interception is authorized" which should not be for a longer period than necessary under the circumstances, and not exceeding 30 days (unless an extension, or renewal is granted). Further the order must direct that the "interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under [the] act."

In our judgment the order here satisfied the conditions imposed by section 12 and was not overbroad in its authorization. The limitation of the tap to between 10 A.M. and 3 P.M. Monday through Saturday was not unreasonable under the circumstances. The expert testimony asserted those hours represented the likely period for the making of calls relating to bookmaking and the police investigation revealed that Dye would probably be at work during that period. More-

over, since search for inculpatory evidence of conspiracy as well as bookmaking was to be the aim of the tap, obviously the Law Division judge was on sound ground in believing that the pattern of the bookmaking conspiracy being engaged in by Dye and his associates might reasonably require a 30-day period for ascertainment of its methods and participants. It was likewise reasonable for the court to feel that a single conversation — or even a very limited number of conversations — involving Dye might only support a view that he was a bettor and not a bookmaker.

It is true that all of the telephone conversations which occurred between 10 A.M. and 3 P.M. over the 24-day period were recorded. However, as already noted, at the end of each day the detective, who was regularly on the scene overseeing the recording, recorded only the incriminating conversations on the work tape. This practice removed, sealed and secured the remainder of the partially used conversations, and also the remaining irrelevant conversations regardless of the parties to those wholly excluded calls.

But, defendant says the procedure followed violated both the order to tap and the statute which required that the operation "be conducted in such a way as to minimize or eliminate the interception of communications other than the type [relating to] the offenses of Bookmaking and Conspiracy." Therefore, he contends, citing *United States v. Scott,* 331 *F. Supp.* 233 (D. D. C. 1971), (appeal pending), that the entire wiretap evidence should be suppressed. We cannot agree.

The basic constitutionality of the electronic interception statute is not in doubt. We agree with the Law Division's view on that subject as expressed in *State v. Christie, supra,* 112 *N. J. Super.* 48. Although the United States Supreme Court has not passed upon the federal counterpart, the Federal District Court and Court of Appeals cases to date have approved its constitutionality. *United States v. Cox,* 449 *F.* 2d 679 (10 Cir. 1971), *cert.* den. 405 *U. S.* 932, 92 S. Ct. 1783, 32 *L. Ed.* 2d 136 (1972); *United States v. Focarile,* 340 *F. Supp.* 1033 (D. Md. 1972); *United States v. Lagorga,*

*336 F. Supp.* 190, 192–193 (W. D. Pà. 1971); *United States v. King,* 335 *F. Supp.* 523, 531–532 (S. D. Cal. 1971); *United States v. Perillo,* 333 *F. Supp.* 914 (D. Del. 1971); *United States v. Leta,* 332 *F. Supp.* 1357, 1359–1361 (M. D. Pa. 1971); *United States v. Scott, supra,* 331 *F. Supp.* at 238–241; *United States v. Cantor,* 328 *F. Supp.* 561, 568–569 (E. D. Pa. 1971); *United States v. Sklaroff,* 323 *F. Supp.* 296, 304–308 (S. D. Fla. 1971); *United States v. Escandar,* 319 *F. Supp.* 295 (S. D. Fla. 1970). Moreover as we have already pointed out the order to tap was in proper form and was validly issued on affidavits showing probable cause therefor. The Fourth Amendment condemns only unreasonable searches and seizures, so the issue here becomes whether the work copy tapes showing the interception of irrelevant portions of some of Dye's telephone conversations, of at least one conversation with him unrelated to bookmaking or conspiracy, and several conversations to which he was not a party, requires suppression of the great mass of inculpatory conversations in the work copy tapes which were introduced in evidence. Since tapes covering 105 hours, after being sealed by the judge who issued the wiretap order, were never again removed from the prosecutor's safe and were not introduced in evidence, neither the nature of those conversations nor the persons involved appears in the record. Consequently (aside from the plain implication that they were not incriminatory because the State represented that the work copy tapes contained all the recorded incriminatory conversations) we cannot know from the record whether all the excluded telephone call matter consisted of the non-inculpatory parts of Dye's conversations, or some wholly innocent discussions or some conversations that did not involve Dye at all.

Obviously all the non-relevant telephone conversations contained in the original tapes would have been excluded at the trial on defendant's objection, or in the court's discretion on its own motion, or in advance of trial on a motion to suppress. But that fact, of itself, would not render inadmissible at the trial the recorded work tapes bearing the in-

culpatory material. In the ordinary case where articles of personal property are seized pursuant to a valid warrant, and the seizure of some of them is illegal as beyond the scope of the warrant, those illegally taken may be suppressed, or excluded at the trial, but those within the warrant do not become so tainted as to bar their receipt in evidence. *United States v. Thweatt,* 140 U. S. App. D. C. 120, 433 *F.* 2d 1226, 1232, n. 7 (D. C. Cir. 1970); *United States v. King, supra,* 335 *F. Supp.* at 544–545; *United States v. Leta, supra,* 332 *F. Supp.* at 1360; *United States v. Escandar, supra,* 319 *F. Supp.* at 300–301; *United States v. Langford,* 303 *F. Supp.* 1387 (D. Minn. 1969). See also *Stanley v. Georgia,* 394 *U. S.* 557, 570–572, 89 S. Ct. 1243, 22 *L. Ed.* 2d 542, 552–553 (Black, J., concurring (1969)); *United States ex rel. Nickens v. LaVallee,* 391 *F.* 2d 123 (2 Cir. 1968), aff'g 279 *F. Supp.* 248 (S. D. N. Y. 1967); *United States v. Castle,* 213 *F. Supp.* 52, 56 (D. D. C. 1962), aff'd on other grounds, 120 U. S. App. D. C. 398, 347 *F.* 2d 492 (D. C. Cir. 1963), *cert.* den. 381 *U. S.* 929, 85 S Ct. 1568, 14 *L. Ed.* 2d 687, 381 *U. S.* 953, 85 S. Ct. 1811, 14 *L. Ed.* 2d 726, reh. den. 382 *U. S.* 874, 86 S. Ct. 13, 15 *L. Ed.* 2d 116 (1965), *cert.* den. 388 *U. S.* 915, 87 S. Ct. 2129, 18 *L. Ed.* 2d 1356 (1967).

The requirement of section 12, *supra,* and the order that the wiretap be conducted in such a manner as to minimize communications other than those relating to bookmaking and to conspiracy with respect to bookmaking, is the same in our statute as in the Federal Act, 18 *U. S. C. A.* § 2518(5). No standards or guides are laid down in either enactment to achieve minimization. It must be assumed that both lawmaking bodies intended a realistic approach to the problem. We take judicial notice that the telephone is an instrument commonly used in bookmaking, and that usually more than one person is engaged in the illegal operation. For example, the evidence garnered in this case shows that bettors placed horserace bets with Dye over the tapped phone, that Dye tele-

phoned the bets to his superiors and confederates, and apparently that the telephone was used to cover or to lay off some of the bets.

Obviously there is no way of predicting in advance what telephone call will be unrelated to bookmaking or conspiracy to engage in such a criminal operation. Nor is there any way of knowing whether a telephone call which starts out innocently will turn to pursuits of the criminal enterprise before it terminates. If there is to be an ironclad rule that as soon as an intercepted call appears to be irrelevant, the monitoring must cease, obviously the participants in organized criminal gambling activities will become aware of it. In such an attack and defense milieu, must law enforcement officials ignore the probable fact that regular bettors and bookmakers will begin on an innocent note and somewhere along the way or just before termination turn to the criminal activity? And in such a pattern of operation, in the ordinary case, is there any reasonably certain method of knowing before actual termination of the call whether it will have a criminal content? For example, as was noted in *United States v. King, supra,* 335 *F. Supp.* at 541, one telephone conversation ran for 44 pages in the transcript of the tapes. Yet it was "totally irrelevant" except for two pages right in the middle, where it turned briefly but pointedly to the conspiracy.

From a practical standpoint courts must recognize the obvious fact that officers monitoring the tap cannot be sufficiently prescient to know that a particular conversation will remain innocent and irrelevant. Telephone calls commonly embark upon social matters, or items of daily interest before turning to their true purpose. Someone other than the person for whom the call is intended may answer and engage in innocuous chatter before turning the phone over to the person called. Certainly, where a call involves a person or persons who appear to be connected with the developing criminal pattern, it would be unreasonable to require the monitoring to cease before termination of the call regardless of its length. Moreover, where the tap is authorized because of

probable cause to believe that a gambling conspiracy exists, and a major purpose is to uncover as many of those involved as possible, it would seem just and necessary to be more liberal in terms of coverage and content of the calls and persons making them. In such situations, just as in the present one, it must be kept in mind that the purpose of the wiretap was two-fold; one was to accumulate evidence of bookmaking against Dye, and the other to discover the scope of the illegal conspiracy, its method of operation and the persons involved in it. Conceivably, there would be some calls where after listening for a period, the officer should realize that the conversation will continue to be innocent and therefore he should terminate the tap. But to command an oversensitive exercise of discretion on pain of exclusion of all the legitimate fruits of the wiretap period, would be to utilize hindsight to impose a mandate for prophecy.

The Legislature in enacting the statute must have been aware of the difficulties which would beset wiretapping, and therefore expected the kind of administration by the courts which would reasonably accomplish the desired purpose, and at the same time pay more than lip service to the right of privacy. In ordaining that a lawful wiretap justified by probable cause to engage in it, should be "conducted" in such a way as to minimize irrelevant communications, it is most unlikely that the lawmakers intended to direct that all legitimate fruits of the interception should be denied use as evidence of crime because the well nigh inescapable occurred, *i. e.,* some or even a substantial number of non-criminal communications were not monitored out. Except in unusual circumstances which can be dealt with only as they arise, the legislative objective and the various interests involved can be served reasonably by admitting the relevant communications and excluding or suppressing the irrelevant. *United States v. King, supra,* 335 *F. Supp.* at 538. In this connection it should not be overlooked that some advantage may accrue to the defendant and to the State when all of the telephone conversations are recorded (except per-

haps those which begin, continue and terminate in such patent irrelevancies that no reasonable investigator would fail to cut off the interception). In such case, if the full original tapes are retained and available for inspection and comparison on defendant's request, it could not be said that the work tapes contain statements out of context, or that the conversations were edited to his detriment, or that qualifying or explanatory parts thereof were excised or erased.

In our view it was well within the trial court's discretion to hold that the wiretap was "conducted" properly and to admit in evidence the inculpatory material which had been recorded on the work tape, from which the irrelevant conversations (although available to the defendant for inspection and study) had been excluded. *United States v. King, supra,* 335 *F. Supp.* at 549.

Administration of wiretapping and electronic surveillance statutes of the type before us is in the relatively early stages. We have been referred to no case precisely like the present one in any other jurisdiction. Defendant relies in part upon the Law Division decision in *State v. Molinaro,* 117 *N. J. Super.* 276 (Cty. Ct. 1971). That case is presently under review and while we would not follow any portion of it which conflicts with the holding here, we reserve consideration thereof until the appeal reaches us. However, it may be said that a substantial majority of the cases wherein the duty to minimize issue was raised have espoused the view that suppression or excision should be ordered only as to the specific interception which is found to be unlawful. Such a rule provides the means of realizing the societal benefits to be gained from crimes solved or prevented through wiretapping. We agree that the Legislature might properly conclude that such benefits outweighed the limited invasion of privacy represented by inclusion of some non-inculpatory conversations which, following the recording, would be carefully removed from the tapes, sealed and not used for any prejudicial purpose. We accept the common sense judicial

approach of those cases that only to the extent that the interception includes irrelevant communications should it be deemed an unreasonable search and seizure within the contemplation of the Fourth Amendment. See, *United States v. Cox, supra,* 449 *F.* 2d at 686–687; *United States v. Focarile, supra,* 340 *F. Supp.* at 1033; *United States v. Lagorga, supra,* 336 *F. Supp.* at 195–197; *United States v. King, supra,* 335 *F. Supp.* at 538, 543–545; *United States v. Sklaroff, supra,* 323 *F. Supp.* at 316–317.

"Irrelevant" in this connection has been given a circumscribed application. For example, if in the course of a wiretap which was authorized to investigate a gambling or drug conspiracy, a conversation turns to the commission of an unrelated crime, failure to terminate the interception will not bar use of the evidence in proving the crime discussed. In *Cox* the wiretap was authorized in a narcotics investigation. In the course of the monitoring, conversations were overheard and recorded relating to the robbery of a bank. On later trial of an indictment for the robbery, objection was made to introduction of the conversations on the ground that they were beyond the ambit of the wiretap order and therefore were violative of the Fourth Amendment. In rejecting the contention, the Tenth Circuit Court of Appeals said:

It would be the height of unreasonableness to distinguish between information specifically authorized and that which is unanticipated and which develops in the course of an authorized search such as that involved here. It would be irrational to hold that officers authorized to listen to conversations about drug traffic, upon learning that a bank robbery is to occur, must at once close down the project and not use the information to prevent the robbery since the information is tainted. It would be demoralizing to allow the bank to be robbed while the investigators stood by helpless to prevent the occurrence. * * * For example, in electronic surveillance of organized criminals involved in gambling, information might be intercepted disclosing a conspiracy to commit murder. Surely the officials must be empowered to use this information notwithstanding the lack of specific prior authorization. 449 *F.* 2d at 687.

This viewpoint is consistent with sections 14 and 17 of our wiretapping statute, which contemplate the making of duplicate tapes of the type of conversations involved in *Cox*, and delivery of them to the appropriate officer to be used in the performance of his duties. *N. J. S. A.* 2A:156A–14, 17, subd. a.

As noted earlier, defendant relies upon *United States v. Scott, supra,* 331 *F. Supp.* 233, in support of his contention that the monitoring officer's failure to exclude irrelevant conversations from the original tape made the entire tape, including the incriminatory excerpts, inadmissible at his trial. We are unable to agree with the restrictive view adopted in *Scott*. The Federal courts in *United States v. Lagorga, supra,* 336 *F. Supp.* at 196–197, and *United States v. King. supra,* 335 *F. Supp.* at 544–545, reached a sounder result by utilizing the general law of search and seizure. They pointed out that under such law if some of the items seized pursuant to a warrant satisfy its requirements, the fact that other seized items were beyond the scope of the warrant and therefore must be suppressed, does not require that all of the evidence seized must be denied admission at the criminal trial. In light of the public policy being served by the wiretapping statute, the *Lagorga* and *King* courts declared that the minimal loss of privacy by those who are not defendants and who would not actually benefit from suppression, would not justify total suppression of the tapes.

## VI

Two additional grounds of appeal may be considered together. They relate to an alleged violation of section 20 of the act, *N. J. S. A.* 2A:156A–20, and to the refusal by the court before trial to grant part of defendant's motion for a bill of particulars.

Section 20 provides:

The contents of any wire or oral communication intercepted in accordance with the provisions of this act, or evidence derived therefrom, shall not be disclosed in any trial * * * unless not less than 10 days before the trial * * * the parties to the action have been served with a copy of the order and accompanying application under which the interception was authorized.

[This service] may be waived by the court where it finds * * * that the parties will not be prejudiced by the failure to make the service.

As noted above, about five months before trial defendant sought copies of the application and supporting affidavits for the wiretap order, and of the order. In the same motion particulars were demanded as to "the exact time and place of each separate instance of bookmaking" charged against the defendant; also an itemization of all bets allegedly taken by the defendant, "specifying with particularity each separate bettor, the amount of each bet and the sporting contest which was the subject of each bet."

 At the argument of the motion it was made plain to defendant that the evidence on which the State intended to rely primarily in support of the indictment was obtained through wiretapping. In addition the prosecutor agreed to furnish and shortly thereafter did furnish a transcript of the wiretap evidence by means of which it expected to prove (and later did prove) Dye's bookmaking activities. The trial court considered that transcript a sufficient specification to satisfy the demand for particulars. We see no abuse of discretion in that regard.

With respect to the demand for copies of the wiretap authorization and the application therefor, the record is not clear as to the parties understanding of the result of the argument and the significance of the court's order.

It seems apparent from the argument that defense counsel and the prosecutor were familiar generally with the various provisions of the wiretap act. Section 15 requires that applications to wiretap, the supporting papers and the orders therefor "shall be sealed by the court and shall be held in custody as the court shall direct and * * * may be

disclosed only upon a showing of good cause before a court of competent jurisdiction." *N. J. S. A.* 2A:156A–15. (Yet neither party made specific reference to the quoted latter part of the section.) The argument of the motion was not heard by the Law Division judge who granted the order. The State asserts it was its impression that an order had to be obtained from the issuing judge to release copies of the application and order. The prosecutor's argument before the motion judge seems to support this assertion, and clearly indicates that he would have consented to an order for presentation to the issuing judge for release of the copies. And the motion judge apparently did not realize that he had authority to grant such an order himself.

To add to the confusion, we observe that number 13 of the demand for particulars relates to the application and the order to wiretap. Yet in the course of advising the motion judge of his consent to comply with a number of the demands, the prosecutor said:

> Twelve and *thirteen* pertain to the wiretap transcripts, and, as I said, I'll consent to an order to be signed [by the issuing judge] to give him those transcripts.
>
> And, fourteen, the Grand Jury testimony, we will give him.
>
> THE COURT: All right. Then the only matter that you have really refused is number four?

Defense counsel then asked to be heard and in the course of his remarks did not disagree about the purport of demand number 13. The misunderstanding apparently was continued in the order, consented to as to form, which followed the argument on the motion. The order denied request number 13, and immediately thereafter ordered that "the transcript of the telephone conversations can be obtained only upon application to [the] Assignment Superior Court Judge * * *, which application is consented to by the State * * *." Although defense counsel was given the transcript of the work tapes thereafter with the State's consent, the matter of the copies of the order for the wiretap

and the application was never pursued, and so far as the record shows defense counsel never called the matter to the attention of the prosecutor.

On the first day of the trial during the prosecutor's opening to the jury, defense counsel objected to any reference to wiretap material because he had not been furnished with copies of the documents, which, under section 20 of the statute, he was entitled to receive not less than 10 days before the trial. On learning of the background of the situation, the trial judge directed the prosecutor to furnish the copies immediately, and said that before proceeding further with the trial he would allow defendant, after examining them, to request and have a hearing on a motion to suppress the wiretap. When defendant seemed reluctant to indicate whether a day or a day and and a half might be sufficient for the purpose, after further discussion, the judge said the trial would proceed, and, if defendant wished, a motion to suppress would be entertained after the verdict. The trial then continued over defendant's objection. Solution of the exigent problem rested in the trial court's discretion. Defendant made no specific request for a longer cessation of the trial than the tentative suggestion of a day or day and a half, nor did he move for a mistrial; his interest appeared to be a desire to rest on the tactical advantage believed to be held. In view of all the circumstances confronting the court at the time, we see no unreasonable exercise of discretion in ordering the trial to proceed.

The purpose of section 20 of the act seems to be to let the defendant know at least 10 days before trial that wiretap evidence will be used against him, and to give him an opportunity to consider the validity of the application and order for the wiretap. Here, defendant knew five months before trial that such proof would be introduced; more than that, he was furnished with a transcript of all of the intercepted conversations which the State would rely on to prove his guilt. Thus the question becomes whether defendant suf-

fered any substantial prejudice because he did not have the specified documents 10 days before the trial began.

Under section 20, if the court finds such service is not practical and the defendant will not be prejudiced, it may be waived by the court. As we have indicated earlier, the failure to make service within the time period was inadvertent. Under section 15 someone had to obtain a court order to secure release of the application and wiretap order. Defendant requested them in his demand for particulars and at the argument the prosecutor said he would consent to such an order. But defendant never pursued the matter further, either by calling it to the prosecutor's attention, or applying for the order himself referring the court to section 15 of the statute. While section 20 purports to impose the primary burden on the State, we are satisfied that the prosecutor's failure to obtain the release order and then serve the documents on defendant within the time limited was inadvertent and not chargeable to bad faith. In fact the discussion of the parties and the judge who heard the motion on defendant's demand for particulars gives the impression that the recency of the statute created some uncertainty as to the procedure required.

Our Rules Governing Criminal Practice generally require motions to suppress in search and seizure cases to be made within 30 days after plea to the indictment. Compliance would not be possible in a wiretap case if the State served the defendant with copies of the wiretap order and supporting papers 10 days before trial — as section 20 of the statute permits. But Rule 3:5–7, subd. a authorizes the making of a motion to suppress after the trial begins, if the court finds it could not reasonably have been made prior thereto. Moreover, even after verdict and on appeal, where the circumstances warrant, the reviewing court may remand the cause to the trial court to permit a motion to suppress to be made. *State v. Burton,* 99 *N. J. Super.* 52 (App. Div. 1968).

Consideration of the unusual circumstances present in this case convinces us that defendant suffered no prejudice because the trial proceeded with a right to make a suppression motion after trial reserved. The motion when made after trial was predicated upon the alleged insufficiency of the application and supporting affidavits to show probable cause for the wiretap order, and upon the alleged failure to satisfy the statutory conditions for such an order. It was not heard by the judge who tried the case, but was presented purposely with approval of the parties to another judge who would bring a fresh mind to this aspect of the case, who would hear it as if it were being made before trial.

After argument the motion was denied. For the reasons expressed earlier in this opinion, we agree with that result. Issuance of the order authorizing the wiretap was within the terms of the statute and was based upon a properly supported application.

## VII

After considering all of the grounds of appeal advanced by defendant, we are satisfied that his guilt of the offense charged was amply justified by the evidence, and that he suffered no such prejudicial error in any phase of his case which would call for a reversal of the jury verdict. Accordingly, his conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For reverasl*—None.