IN THE MATTER OF AN IN-PROGRESS TRACE OF A WIRE
COMMUNICATION TO BE MADE TO AND INTERCEPTED
OVER TELEPHONE FACILITY NUMBER, ETC.

Argued April 5, 1977—Decided April 28, 1978.

256

*Mr. Bernard M. Hartnett, Jr.* argued the cause for appellant New Jersey Bell Telephone Company (*Mr. Hartnett* and *Mr. Thomas E. Walsh, Jr.,* attorneys).

*Mr. R. Benjamin Cohen,* Assistant Prosecutor, argued the cause for respondent State of New Jersey (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney; *Mr. Cohen* and *Mr. Marc J. Friedman,* Assistant Prosecutor, on the brief).

*Mr. Lewis J. Paper* submitted a brief on behalf of *amicus curiae* American Civil Liberties Union of New Jersey.

The opinion of the court was delivered by

SCHREIBER, J. We are called upon in this case to interpret the technical assistance provision of the New Jersey Wiretapping and Electronic Surveillance Control Act, *N. J. S. A.* 2A:156A–12. More particularly, the issue is whether under that provision a court may order a telephone company to trace a phone call so as to ascertain a phone number (and presumably the identity of the person calling from that number) from which calls are being made to another telephone which has been subjected to a lawful intercept order.

The question arose in a virtually undisputed factual setting. On September 18, 1975 the Assignment Judge of Essex County authorized the prosecutor to intercept a phone used for gambling operations (hereinafter referred to as phone #1) for 30 days. Pursuant to that order, conversations were intercepted from September 20, 1975 to September 24, 1975. When the New Jersey Bell Telephone Company refused the prosecutor's request to make an in-progress trace to ascertain a number (phone #2) from which calls were being made to the intercepted phone, the prosecutor obtained an order to show cause why the company should not be compelled to comply with his request. As disclosed in his moving papers, the prosecutor sought the in-progress trace to identify a person calling the tapped phone. The prosecutor made it clear in the oral argument before the

Assignment Judge that the request was being made exclusively on the basis of the existing order to intercept phone #1. No technical assistance was being sought to tap phone #2.

The Assignment Judge denied the order. He reasoned that the State was "starting a new interception," and that no technical assistance was necessary to intercept phone #1. He stated that he would entertain an application supported by the appropriate affidavits to compel the company to furnish technical assistance to intercept phone #2. The State appealed. Only subsequent to the oral argument before the Appellate Division on the ultimate issue of whether the New Jersey Wiretapping and Electronic Surveillance Act, *N. J. S. A.* 2A:156A–1 *et seq.* (hereinafter "New Jersey Act"), authorized an in-progress trace on the basis of an existing wiretap intercept, did that court, *sua sponte,* request briefs on whether, apart from the statute, a court had the power to compel an in-progress trace. The Appellate Division reversed. 138 *N. J. Super.* 404 (1975). It first held that the telephone company could be compelled to make a trace "by grand jury subpoena or by court order similar to a search warrant." *Id.* at 407. Second, it interpreted the technical assistance provision of the New Jersey Act to authorize use of an in-progress trace to obtain information concerning the identity of a party calling to the intercepted phone.

We granted the telephone company's petition for certification. 70 *N. J.* 144 (1976). The American Civil Liberties Union was granted leave to intervene as *amicus curiae* and to file a brief.

The New Jersey Act, *N. J. S. A.* 2A:156A–1 *et seq.,* authorizes the Attorney General, a county prosecutor or the chairman of the State Commission of Investigation to apply for and obtain, under certain circumstances, an order authorizing interception of a wire or oral communication, *N. J. S. A.* 2A:156A–8. In the order authorizing *that* interception, the court, upon request, must direct the tele-

phone company to furnish all *"technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier is affording the person whose communications are to be intercepted,"* that is, the phone being tapped. *N. J. S. A.* 2A:156A–12. A fair reading of this language makes it clear that the assistance called for is that necessary physically and mechanically to "accomplish the interception." The word "intercept" is defined as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." *N. J. S. A.* 2A:156A–2c. "Contents" is defined to include any information concerning the identity of the parties to such communication. *N. J. S. A.* 2A:156A–2g. It is clear that contents refers only to the information obtainable through the *aural* acquisition of the interception.

The nature of the technical assistance which may be compelled under the New Jersey Act is strictly limited. The only assistance sanctioned is that type necessary to make the interception unobtrusively and with a minimum of interference to the phone being tapped. The assistance must be directed to eliminating any disruption of service to the tapped phone in such a manner that the user of that phone will not be aware it is being tapped. The in-progress trace, which is a method of tracing a phone call to the point of origin, is not related to those purposes and does not inch the interception any closer to those objectives.

It is essential to recognize that an in-progress trace in no way monitors a tapped phone. The tracing process identifies electrical paths and mechanical instrumentalities in use in a given time period. It does not disclose whether a communication occurred or, if it did, the aural contents of that communication. It in no way assists in accomplishing interception of the phone being tapped, but, rather, traces a phone call made to a tapped phone back to its place of origin and then prints the number from which the call has been made. *See State v. Hibbs,* 123 *N. J. Super.* 152,

154–159 (Mercer Cty. Ct. 1972) (describing mechanics of an in-progress trace), aff'd 123 *N. J. Super.* 124 (App. Div. 1973).

In this case the phone company had furnished the necessary assistance for an interception and the prosecutor had been successfully tapping phone #1 and recording conversations for four or five days. Apparently that interception had been and was being undertaken unobtrusively and with a minimum of interference. The conversations were being overheard. The request for the in-progress trace was, if anything, a testament to the success of the interception. The mere inability to identify the party who had made the call to the intercepted phone or to understand comments during the conversations does not mean that the interception had not been accomplished. The prosecutor was not seeking assistance necessary to accomplish the interception of phone #1. What he really desired, as reflected in the detective's affidavit on which the prosecutor relied on the motion, was "an electronic surveillance" of the telephone facility which would be revealed by the in-progress trace, that is, phone #2.

██ Our construction of the act to disallow the in-progress trace sought here accords due deference to constitutional precepts and legislative policy. Wiretap statutes implicating as they do an intrusion into individual rights of privacy, constitutionally and legislatively recognized, should generally be strictly construed. The Fourth Amendment protection from unreasonable searches is well settled. In *Katz v. United States*, 389 *U.S.* 347, 88 *S. Ct.* 507, 19 *L. Ed.* 2d 576 (1967), a decision suppressing evidence obtained by an electronic recording device attached to the outside of a public telephone booth, Mr. Justice Stewart wrote:

The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a

"search and seizure" within the meaning of the Fourth Amendment. [389 *U. S.* at 353, 88 *S. Ct.* at 512, 19 *L. Ed.* 2d at 583]

Because of this constitutional principle the United States Supreme Court has construed the federal wiretap act (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 *U. S. C. A.* §§ 2510–2520) strictly. *United States v. Giordano,* 416 *U. S.* 505, 94 *S. Ct.* 1820, 40 *L. Ed.* 2d 341 (1974); *United States v. Chavez,* 416 *U. S.* 562, 94 *S. Ct.* 1849, 40 *L. Ed.* 2d 380 (1974). *See* J. L. Cranwell, "Judicial Fine-Tuning of Electronic Surveillance," 6 *Seton Hall L. Rev.* 225, 266 (1975). The Fourth Amendment to the Federal Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment, *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed.* 2d 1081 (1961), is restated in the New Jersey Constitution. *N. J. Const.* (1947), Art. 1, par. 7, and its policy likewise calls for a strict construction of the New Jersey Act. *See also State v. Fariello,* 71 *N. J.* 552, 559 (1976).

Furthermore, the New Jersey Legislature has seen fit to condemn tapping a telephone line. A 1930 law made it a misdemeanor to tap or make any connection with a telephone line or to aid any person to cause that to be done. *L.* 1930, *c.* 215, § 1, p. 987. This proscription was continued until 1968, see *R. S.* 2:171–1 (1937) and *N. J. S. A.* 2A:146–1, when it was repealed, *L.* 1968, *c.* 409, § 27, and replaced by a substantially similar ban included in the wiretapping statute under review. *See L.* 1968, *c.* 409, § 3. For a case discussing the broad sweep of the former prohibition, see *Morss v. Forbes,* 24 *N. J.* 341 (1957). The existing successor provision prohibits any person from wilfully intercepting or procuring any other person to intercept any wire or oral communication except as provided in the New Jersey Act. *N. J. S. A.* 2A:156A–3. When the federal and state constitutions protect the individual's right of privacy and the Legislature has seen fit to prescribe an all-inclusive

safeguard against wiretaps, it is fitting and proper to hold that the prosecutor comply fully with the conditions under which an exception to the general prohibition may be permitted.

The legislative history of the technical assistance provision accords with the interpretation we have adopted. Since the New Jersey Act was patterned after the federal law, it is instructive first to consider the federal legislation and its interpretation.

It was in 1968 that Congress enacted the provisions under which tapping by federal officers was permitted. 18 *U. S. C. A.* §§ 2510–2520. The federal statute also authorized the states to enact laws permitting wiretaps provided that as a minimum the federal safeguards be incorporated. 18 *U. S. C. A.* § 2516(2). Thereafter, New Jersey adopted its act modelled after the federal law. *N. J. S. A.* 2A:156A–1 *et seq.* When it was held that a court did not have the power under the federal act to compel a telephone company to assist the government in making an interception, *Application of the United States for Relief,* 427 *F.* 2d 639 (9th Cir. 1970), Congress promptly amended the law to provide for such technical assistance, the amendment reading as follows:

An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates. [18 *U. S. C. A.* § 2518(4)]

No mention of an in-progress trace was made throughout the extensive Congressional proceedings which preceded adoption of the "technical assistance" provision in the fed-

eral law. *See, e.g.,* S.2601, 91st Cong., 2d Sess. (1970); 116 *Cong. Rec.* 8962, 24460, 25202 (1970); H. R. Rep. No. 91-1303, 91st Cong., 2d Sess. (1970). This omission is understandable because on its face the amendment was addressed only to the help necessary to accomplish the interception unobtrusively and with a minimum of interference to the tapped phone.

In 1975 New Jersey modified its statute to include an amendment with almost identical language. *L.* 1975, *c.* 131, § 8. The Statement to the Act declares that the bill added a specific requirement that a communication common carrier could be required to furnish technical assistance in order to conform to the federal law. Senate Judiciary Comm., Statement to S.1417 (May 19, 1975). The State acknowledges that the New Jersey amendment was designed only to conform state law with the federal act.

Though no New Jersey case has been directed to the propriety of an order for an in-progress trace, the relevant federal decisions indicate that an in-progress trace may not be authorized under the act. In *Michigan Bell Telephone Co. v. United States,* 565 *F.* 2d 385 (6th Cir. 1977), during an ongoing wiretap, the government sought an in-progress trace. Its avowed purpose, as in the instant case, was to identify the higher links in a gambling operation. There, as here, the person whose phone was monitored never called but was always called by his supervisor. The Circuit Court held that installation of in-progress traces could not be ordered under the federal act.[1]

More importantly, the United States Supreme Court recently agreed that the federal wiretap act does not authorize a compulsive order directing installation of a pen

---

[1] The Court did not discuss the technical assistance provision of the act probably because it patently has no application to an in-progress trace. The Court found authority for a trace in sources other than the act.

register.[2] *United States v. New York Telephone Co.*, 434 U. S. 159, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977). In that case the FBI had, pursuant to court order, tapped two telephones in New York City. Subsequently, after expiration of the court order, it sought permission to operate pen registers on those phones to identify associates and confederates. The United States District Court, although holding that the federal act did not authorize it to compel the telephone company to install a pen register, granted the order on other grounds. *Application of United States in Order Authorizing Use of a Pen Register*, 416 F. Supp. 800 (S. D. N. Y. 1976). On appeal the Second Circuit held that the telephone company could not be compelled to furnish pen registers under the federal wiretapping law either directly or as a corollary for technical assistance. 538 F. 2d 956, 961 (1976). The United States Supreme Court unanimously concluded that the federal act did not cover pen registers. Five justices upheld the order under the All Writs Act, 28 U. S. C. A. § 1651(a).

Noting that every Court of Appeals that has considered the matter has found that pen registers are beyond the scope of the federal act, and citing *United States v. Illinois Bell Telephone Co.*, 531 F. 2d 809 (7th Cir. 1976); *United States v. Southwestern Bell Telephone Co.*, 546 F. 2d 243 (8th Cir. 1976); *Michigan Bell Telephone Co. v. United States, supra; United States v. Falcone*, 505 F. 2d 478 (3d Cir. 1974), cert. den. 420 U. S. 955, 95 S. Ct. 1339, 43

---

[2]The pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It captures the sound of dialing and these impulses are recorded and translated into the number dialed. These sounds are also found on the wiretap tape. The pen register eliminates the mechanical step of translating the sounds into the number dialed. The pen register in a sense records information from the phone which is being tapped. Arguably then a pen register assists in accomplishing an interception because of its monitoring function. This is not true of an in-progress trace, for the phone number of the person calling the tapped phone is not aurally recorded in any form or manner on the wiretap tape.

*L. Ed.* 2d 432 ,(1975); *Hodge v. Mountain States Telephone & Telegraph Co.,* 555 *F.* 2d 254 (9th Cir. 1977); *United States v. Clegg,* 509 *F.* 2d 605 (5th Cir. 1975), Mr. Justice White, writing for the majority, pointed out that the statute was concerned only with orders "authorizing or approving the *interception* of a wire or oral communication * * *," 434 *U. S.* at 166, 98 *S. Ct.* at 369, 54 *L. Ed.* 2d at 386, quoting 18 *U. S. C.* § 2518(1). He observed that "intercept" was defined to mean "the *aural* acquisition of the *contents* of any wire or oral *communication"* and that pen registers do not "intercept" because they do not acquire the "contents" of communications.[3] 434 *U. S.* at 166, 98 *S. Ct.* at 369, 54 *L. Ed.* 2d at 386 (emphasis supplied by Justice White). Mr. Justice White also stated:

They [pen registers] disclose only the telephone numbers that have been dialed — a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed are disclosed by pen registers. Furthermore, pen registers do not accomplish the "aural acquisition" of anything. [*Id.*]

Similar comments may be made with respect to in-progress traces except the trace discloses the telephone number which was the source of the call into the intercepted phone and does not obtain that information from the sounds emanating from the tapped phone.

*Michigan Bell* and *New York Telephone* indicate that the federal law is to be strictly construed. *See also* Comment, 1977 *Duke L. J.* 751, 769–770. The legislative history of the New Jersey Act supports a comparable interpretative approach. As we have previously observed, neither the New Jersey Act nor the federal statute when originally enacted contained the technical assistance paragraph in question. After the federal law was amended to include that paragraph, there was introduced in the State Legislature Senate Bill

---

[3]The definitions used in the New Jersey Act are the same. *Compare* 18 *U. S. C. A.* § 2510(4), (8) *with N. J. S. A.* 2A:156A–2c, g.

1417. It contained the following amendment which adopted language that had been suggested by the Attorney General in his *Report on the New Jersey Wiretapping and Electronic Surveillance Control Act* (Sept. 16, 1974):

An order authorizing the interception of a wire or oral communication shall, upon a showing of special need by the applicant, direct that a communication common carrier use its best efforts to furnish forthwith the applicant with all information, facilities, and technical assistance necessary to accomplish *an in-progress trace or interception.* This assistance shall be provided unobtrusively, and with a minimum of interference with the services that such carrier is affording the person whose communications are to be intercepted. Said order shall limit the hours that the carrier shall be obligated to provide said assistance, and shall specify the circumstances under which an obligation to provide assistance shall arise. Any communication common carrier furnishing such facilities or technical assistance shall be compensated for the costs of any assistance rendered to the applicant. Said carrier shall be immune from civil liability for any assistance rendered to law enforcement pursuant to this section. [*Id.* at 27 (emphasis added)]

At the public hearings before the Senate Judiciary Committee, New Jersey Bell Telephone Company's Vice President objected to this provision. He contended that in-progress tracing would force the company into an active law enforcement role. He also advised that in the telephone company's experience in-progress traces are more often than not unsuccessful. He said that:

[T]here is no other state with a wiretapping law which includes language such as that proposed here and even though the federal act was amended in 1970 so as to authorize the court to direct a communications common carrier to provide technical assistance, this assistance is limited to that necessary to accomplish an *interception* and does not extend to in-progress traces. New Jersey Bell as well as other Bell System companies have consistently rejected requests for such traces from federal as well as state and county law enforcement authorities. [1 *Public Hearing before Senate Judiciary Committee on Senate* No. 1417 at 37A (Jan. 30, 1975)]

He clearly indicated that there was no objection to the "technical assistance" language in the federal act. *Id.* at 45A.

Mr. Karl Asch, then Prosecutor of Union County, testified on behalf of the Attorney General and Prosecutors' Association. He objected to the amendment proposed in the Attorney General's report because it made "it almost as tough to obtain an in-progress trace from the telephone company as it is to obtain a wiretap order to uncover criminal activity." 2 *Public Hearing before the Senate Judiciary Comm'ttee on Senate* No. 1417 at 35A (April 3, 1975). He recommended that the paragraph which had been submitted be retained, but that restrictive features — such as "special need" — be eliminated.

The Legislature adopted the Company's recommendation and rejected that of the Attorney General and Prosecutors. The amended language, as finally adopted, is almost identical with that of the federal act. Having rejected an amendment which would have expressly required the telephone company to assist in making in-progress traces, the New Jersey Legislature has made it abundantly apparent that such a mechanism sought in aid of an ongoing interception was not intended to fall within the purview of the "technical assistance" amendment of the New Jersey Act.

■ The only issue presented to and tried before the Assignment Judge was whether an in-progress trace of telephone #2 could be ordered on the basis of and as part of an intercept order of telephone #1. He noted that the prosecutor was seeking only the identity of the person calling into the tapped phone, in order to start a new interception, and that he should have complied with the requirements of the New Jersey Act for an order to intercept telephone #2. The State did not attempt to meet the requirements for a warrant. The telephone company made no presentation on that question. The trial court did not resolve the factual and legal questions inherent in that problem. The issue having been so limited, it was not necessary or appropriate to determine, as the Appellate Division did, whether a grand jury could compel the telephone company to make an in-progress

trace, or whether a court, upon a proper application and showing, might properly issue a search warrant. Nor do we on this record find it fitting to pass upon these matters.

█ █ The technical assistance provision in the wiretap act, given its common sense meaning, does not authorize an in-progress trace. There may be occasions to venture far from the clear intendment of statutory language in order to avoid an absurd conclusion. But this is not one. Statutes that directly impinge on the individual's right to be free from unwarranted governmental intrusion into privacy should be construed narrowly. Interpretation of the act to authorize compulsion of an in-progress trace, something which no other court has seen fit to do, would distort the language of the statute to invade further the individual right of privacy. In this instance, the Legislature has produced a carefully crafted statute, one that most certainly was constructed with sensitivity to the public distaste for electronic eavesdropping and to the constitutional difficulties raised by this investigative technique. That effort should not be undone.

The judgment of the Appellate Division is reversed and the order of the Assignment Judge reinstated.

HANDLER, J., dissenting. The majority has decided that the New Jersey Wiretapping and Electronic Surveillance Control Act, *N. J. S. A.* 2A:156A–1, *et seq.* (Wiretap Act), does not authorize a court to compel the New Jersey Bell Telephone Company (Bell) to make an "in-progress trace" in conjunction with a court-supervised telephone wiretap for the limited purpose of ascertaining the identity of a party to the intercepted, criminal conversations. I disagree.

The authority for an in-progress trace to be coupled with an ongoing wiretap is the "technical assistance" provision of the Wiretap Act. This section reads:

An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication

common carrier shall furnish the applicant forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier is affording the person whose communications are to be intercepted. Any communication common carrier furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates. Said carrier shall be immune from civil liability for any assistance rendered to the applicant pursuant to this section. *N. J. S. A.* 2A:156A–12(f).

The Wiretap Act further defines the term "intercept" as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." *N. J. S. A.* 2A:156A–2(c).

The majority says that the language of the technical assistance amendment "makes it clear that the assistance called for is that necessary physically and mechanically to 'accomplish the interception' " and that "[t]he *only* assistance sanctioned is that type necessary to make the interception unobtrusively and with a minimum of interference to the phone being tapped." *Ante* at 259. [Emphasis added].

The technical assistance provision was not designed to serve only these cramped and limited ends of rendering a wiretap clandestine and interruption-free. In view of the background of the technical assistance amendment and, generally, the history of technical assistance in conjunction with court-supervised wiretaps, it can hardly be thought that it was intended to require the vital and indispensable expertise of a telephone company solely to keep wiretaps hushed and smooth. The qualifying language emphasized by the majority relating to unobtrusiveness and continuity of telephone service does not define the *kinds* of assistance that can be required of a telephone company. Rather, that language relates to the statutory command that the telephone company "shall furnish * * * all * * * technical assistance necessary", *N. J. S. A.* 2A:156A–12(f), that is, to the *manner* in which the assistance is to be rendered by the telephone company. Thus, it is the evident meaning of this statutory phraseology

that the company, while it is furnishing technical assistance, shall do so in a manner which will not expose the existence of the wiretap or interfere with normal telephonic services.

The key to a correct and sensible construction of the technical assistance provision inheres, I submit, in the fulfillment and completion of the wiretap surveillance as a legislatively-authorized and court-controlled law enforcement tool. The statutory phrase "accomplish the interception" is to be understood in this sense. Wiretap interceptions or "aural acquisitions" are the crux of the surveillances under the Wiretap Act. The focus or target of such interceptions is the "contents" of "wire communications". According to the statute, contents pertain not only to the "existence, substance, purport or meaning" of verbal exchanges over the telephone, but also to "any information concerning the identity of the parties to such communication." *N. J. S. A.* 2A:156A-2(g); *In re In-Progress Trace of a Wire Communication,* 138 *N. J. Super.* 404, 414–416 (App. Div. 1976). The comprehensive nature of the statutory definition of "contents" is underscored by the legislative history to the parallel federal law, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 *U. S. C.* § 2510 *et seq.* (Title III or Federal Act). It is stated in *S. Rep. No. 1097,* 90th Cong., 2d Sess., 1968 *U. S. Code Cong. & Admin. News,* pp. 2178, 2179 (1968) that "[n]o aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded." Hence, "technical assistance necessary to accomplish the interception" under *N. J. S. A.* 2A:156A-12(f) includes not only techniques "necessary physically and mechanically" (the words of the majority) to establish the interceptions as such, but procedures which can be integrated or used in conjunction with the wiretap itself in order, among other things, to identify the parties to a wire communication.

The necessity for technical assistance for this purpose is revealed by this case. The facts make the point. A detective's affidavit submitted in support of the Prosecutor's application

for the in-progress trace recited that the tap, which had been going for just a few days, had revealed that at approximately 4:00 P.M. each day the party at the tapped phone, characterized as a "sitter" who accepts bets, would receive a phone call from a "higher-up" in the gambling operation, a person who would call several sitters in order to record the day's bets. The overheard conversations indicated that all contact between this sitter and her "boss" were through these regular, daily incoming calls. The detective stated that the only way the identity of the boss could be determined was through an in-progress trace accomplished with the technical assistance of Bell. Thus, on these facts, an in-progress trace would have accomplished the underlying interception by enabling the investigating officers to decipher the contents of the oral communications uttered between the tapped phone and the unknown phone by garnering information as to the location of the unknown phone and ultimately the identity of the person who called the tapped telephone to engage in criminal conversations.

In this context, it might be said that an in-progress trace is inextricably related to the "aural acquisition" of the contents of communications.[1] Concededly, the trace is used only

---

[1]The mechanics of an in-progress trace are fully described in *State v. Hibbs*, 123 *N. J. Super.* 152, 154–159 (Cty. Ct. 1972), aff'd 123 *N. J. Super.* 124 (App. Div. 1973). To perform the trace, Bell must connect a "trouble recorder" on the lines of the tapped phone. This recorder will than print out a card identifying the phone number of all incoming calls. *Id.* at 156. The recorder neither monitors the call in any way nor interferes with the sending or receiving of calls. *Id.* at 157. This is a relatively simple operation if the incoming phone call originates from the same Bell central office. *Id.* To discover a number from another central office, however, Bell would have to install a second trouble recorder on the trunk line from the incoming call's central office to the receiving phone's central office. The printed cards from the trunk line recorder would then be checked to find the one made at the exact time the desired call was completed. Then, the second central office would take the "additional

to reveal the identity of the party to an intercepted conversation. But in performing this function, the trace (significantly described as "in-progress") is ordinarily undertaken while the tapped phone is in use and communications are actually occurring and being transmitted by electrical impulses over the telephone wires. See *State v. Hibbs,* 123 *N. J. Super.* 152, 156–159 (Cty. Ct. 1972), aff'd 123 *N. J. Super.* 124 (App. Div. 1973). The tracing is thus simultaneous and coterminous, or very nearly so, with the interceptions, *i. e.* "aural acquisitions", of communications and should not be regarded as something divorced or separable from them.

This interpretation of the technical assistance provision — that an in-progress trace is technical assistance necessary to accomplish an interception — is sensible and serviceable; it is justified by the background and history of the provision, and it preserves the balance struck by the Legislature in the Wiretap Act by accommodating the real concerns for protecting privacy and the genuine needs of law enforcement to combat surreptitious, organized crime.

New Jersey's Wiretap Act, *L.* 1968, *c.* 409, was enacted pursuant to the federal electronic surveillance act and modelled closely upon that law. *State v. Christy,* 112 *N. J. Super.* 48, 53 (Cty. Ct. 1970); Senate Comm. on Law, Public Safety and Defense, *Report on Senate No. 897, Electronic Surveillance* 5 (1968). The Federal Act was later amended to provide for technical assistance in aid of a wiretap (18 *U. S. C.* § 2518 (4)) and the subsequent amendment of the State Wiretap Act for technical assistance virtually mirrors the federal provision. I agree with the majority, therefore, that developments in the federal field with respect to Title III are germane to a proper understanding of the New Jersey counterpart.

---

step" of placing a device on the suspected phone so that when another call was made, Bell could verify that the suspected phone had completed a call to the tapped phone. *Id.* at 157–158.

The genesis for a technical assistance provision in conjunction with legal wiretap surveillances was a federal court decision, *Application of the United States for Relief,* 427 F. 2d 639 (9 Cir. 1970). The court there ruled that it lacked the power to compel the Central Telephone Company of Nevada to aid the Government in effectuating a wiretap, reasoning that Title III did not confer such a power and that the court lacked inherent power to issue an order compelling the telephone company to furnish the requested aid. *Id.* at 642–644. It was unwilling to infer such power from the Federal Act because that statute was a comprehensive enactment presumably encompassing all aspects of electronic surveillance and nowhere did it authorize a court to order assistance from a third party to effectuate a wiretap. *Id.* at 643–644.

Congressional reaction to this decision was immediate. Within weeks, Title III was amended in language nearly identical to that later placed in our statute to empower courts to require technical assistance in implementing court-authorized interceptions. 18 *U. S. C.* § 2518(4).

The most fertile history bearing upon the scope of technical assistance under the federal law involves the use of a pen register,[2] a device comparable and analogous to an in-progress trace. The application of Title III to a pen register turns critically on whether that device is sought to be used independently from or in conjunction with an established, court-supervised wiretap. Federal decisions have unanimously ruled that technical assistance in the form of a pen register may be used in combination with a lawful,

---

[2] A pen register has been described as "a mechanical device attached to a given telephone line and usually installed at a central telephone facility. It records on a paper tape all numbers dialed from that line." *United States v. Giordano,* 416 *U. S.* 505, 549 n. 1, 94 *S. Ct.* 1820, 1842 n. 1, 40 *L. Ed.* 2d 341, 372 n. 1 (1974) (Powell, J., concurring in part and dissenting in part). Although an in-progress trace does not record sound, it performs a virtually identical function as the pen register, *i. e.,* it determines the telephone number of an instrument from which a call is being dialed to the tapped phone.

274

court-supervised wiretap under Title III. Note, "Circumventing Title III: The Use of Pen Register Surveillance in Law Enforcement," 1977 *Duke L. J.* 751, 755 n. 24; *United States v. Volpe,* 430 *F. Supp.* 931 (D. Conn. 1977); *In re Alperen,* 355 *F. Supp.* 372 (D. Mass.), aff'd *sub nom. United States v. Doe,* 478 *F.* 2d 194 (1 Cir. 1973); *United States v. Lanza,* 341 *F. Supp.* 405, 422 (M. D. Fla. 1972); *Application of the United States for an Order Authorizing the Use of a Pen Register Device,* 407 *F. Supp.* 398, 402 (W. D. Mo. 1976) (*dictum*). Indeed, some courts have expressed the view that since a pen register captures no more than the tap itself, a Title III wiretap order is broad enought to encompass the simultaneous use of a pen register. *United States v. Cox,* 567 *F.* 2d 930 (10 Cir. 1977); *United States v. Falcone,* 505 *F.* 2d 478, 482–483 (3 Cir. 1974), *cert.* den. 420 *U. S.* 955, 95 *S. Ct.* 1339, 43 *L. Ed.* 2d 432 (1975); *United States v. Iannelli,* 430 *F. Supp.* 151 (W. D. Pa. 1977); *Commonwealth v. Vitello,* 367 *Mass.* 224, 327 *N. E.* 2d 819 (Sup. Jud. Ct. 1975); see *United States v. John,* 508 *F.* 2d 1134, 1141–1142 (8 Cir.), *cert.* den. 421 *U. S.* 962, 95 *S. Ct.* 1948, 44 *L. Ed.* 2d 448 (1975) (use of a pen register in conjunction with a Title III wiretap is permissible since Fourth Amendment is satisfied); *United States v. Brick,* 502 *F.* 2d 219, 223–224 (8 Cir. 1974) (same); accord, *State v. Murphy,* 137 *N. J. Super.* 404, 435 (Law Div. 1975), rev'd on other grounds 148 *N. J. Super.* 542 (App. Div. 1977) ("[i]n the present case the application to wiretap necessarily involved the use of means [*i.e.* a touch tone decoder] to successfully complete the effort.").

I am persuaded by the reasoning of these decisions holding that Title III authorizes the use of a pen register as an adjunct to an established, court-supervised wiretap surveillance. This approach makes good sense and good policy. Rather than leave such devices unregulated or loosely controlled while there is an ongoing wiretap, it includes these intrusive electronic instruments within the statutory umbrella covering the underlying wiretap and regulates their

installation and operation under the statutory procedures governing the wiretap. J. Carr, *The Law of Electronic Surveillance* 75 (1977) (where a pen register is used in conjunction with surveillance conducted pursuant to a Title III order, "* * * the procedures of § 2518 should regulate installation and operation of the device."); see *In re Alperen, supra; United States v. Lanza, supra; Application of the United States for an Order Authorizing the Use of a Pen Register Device, supra* (*dictum*). In this fashion, the constitutional and statutory imperative that privacy interests be protected is more effectively fulfilled. A successful Title III wiretap application demands the strongest showing of probable cause, a scrupulous compliance with statutory requirements and punctilious adherence to Fourth Amendment strictures, *Berger v. New York,* 388 *U. S.* 41, 87 *S. Ct.* 1873, 18 *L. Ed.* 2d 1040 (1967); *Katz v. United States,* 389 *U. S.* 347, 88 *S. Ct.* 507, 19 *L. Ed.* 2d 576 (1967), as now embodied in the federal wiretap law. These statutory safeguards should be equally applicable to ancillary devices such as pen registers and in-progress traces which in some measure share the penetrating characteristics of the wiretap itself.

It is significant that the Supreme Court in *United States v. New York Tel. Co.,* 434 *U. S.* 159, 98 *S. Ct.* 364, 54 *L. Ed.* 2d 376 (1977), which the majority relies upon for primary support, did not disprove or distinguish the line of authority accepting the combined use of a wiretap and pen register, underscoring the view that the essential ruling of the Supreme Court that Title III does not furnish authority for the use of a non-intercepting device such as a pen register is limited to instances where that device is sought to be used independently from a court-supervised, ongoing Title III wiretap. It also deserves emphasis that the Supreme Court, in holding that *Fed. R. Crim. P.* 41 and the All Writs Act, 28 *U. S. C.* § 1651 (a) authorize a court to order the implementation of a pen register, concluded that

this power was "consistent" with recent Congressional action. The Court stated:

In light of this direct command [of the technical assistance provision] to federal courts to compel, upon request, any assistance necessary to accomplish an electronic interception, it would be remarkable if Congress thought it beyond the power of the federal courts to exercise, where required, a discretionary authority to order telephone companies to assist in the installation and operation of pen registers, which accomplish a far lesser invasion of privacy. [*United States v. New York Tel. Co., supra,* 434 *U. S.* at 176–177, 98 *S. Ct.* at 374, 54 *L. Ed.* 2d at 392].

Although the Supreme Court in making this observation was not dealing with or applying the technical assistance provision of the Federal Act, it apparently considered that a pen register, characterized as a "far lesser invasion of privacy" than a wiretap, was consistent with "any assistance necessary to accomplish an electronic interception" which could be mandated of a telephone company under the "direct command" of the technical assistance provision of Title III. The Court, in this vein, made the further observation that the technical assistance provision was added to the Federal Act, not for the reason that a telephone company could not otherwise be compelled to "assist in a wiretap pursuant to Title III", as declared by the Ninth Circuit in 1970, *Application of the United States for Relief, supra,* but in order to provide "an unequivocal statement of [Congressional] intent under Title III." *United States v. New York Tel. Co., supra,* 434 *U. S.* at 177 n. 25, 98 *S. Ct.* at 375 n. 25, 54 *L. Ed.* 2d at 392 n. 25. Accord, *New England Tel. & Telegraph Co. v. District Atty., Mass.,* 373 *N. E.* 2d 960, 962 (Sup. Jud. Ct. 1978).

It cannot be overstressed that in *New York Tel. Co.,* the pen register was not sought under Title III in conjunction with an ongoing, court-supervised telephone wiretap. The reference by the majority to the opinion of the Second Circuit Court of Appeals in that case, 538 *F.* 2d 956, 961 (2 Cir. 1976) *Ante at* 264, is somewhat misleading. The

appeals court ruled that a pen register order sought inde-
pendently from an established wiretap could not be based
directly on Title III or indirectly as a corollary form of
technical assistance, there being no ongoing wiretap at the
time. The Supreme Court had no occasion, therefore, to
decide whether a pen register could be compelled as a form
of technical assistance incident to a lawful wiretap sur-
veillance pursuant to Title III.

This observation applies with equal force to those decisions
noted by the Supreme Court in *New York Tel. Co.,* as well
as other cases and authorities, generally reflecting the view
that pen registers separate and apart from ongoing wiretaps
are not within the scope of Title III. *E.g., Hodge v. Moun-
tain States Tel. & Telegraph Co.,* 555 *F.* 2d 254 (9 Cir.
1977); *United States v. Southwestern Bell Tel. Co.,* 546 *F.*
2d 243, 245-246 (8 Cir. 1976), *cert. den.,* 434 *U. S.* 1008,
98 *S. Ct.* 716, 58 *L. Ed.* 2d 750 (1978); *United States v.
Illinois Bell Tel. Co.,* 531 *F.* 2d 809, 812 (7 Cir. 1976);
see also *United States v. Clegg,* 509 *F.* 2d 605, 610 n. 6 (5
Cir. 1975); *State v. Droutman,* 143 *N. J. Super.* 322 (Law
Div. 1976) (in-progress trace); *State v. Ramirez,* 351 *A.*
2d 566 (Del. Super. Ct. 1976); Blakey & Hancock, "A
Proposed Electronic Surveillance Control Act", 43 *Notre
Dame Lawyer* 657, 662-663 n. 10 (1968); Note, *supra,*
1977 *Duke L. J.* at 755 n. 24.

The court in *Michigan Bell Tel. Co. v. United States,*
565 *F.* 2d 385 (6 Cir. 1977), cited by the majority for its
ruling that the installation of an in-progress trace during an
ongoing wiretap could not be required of the telephone com-
pany under the federal act, ignored completely the technical
assistance provision of Title III. It relied upon those deci-
sions dealing with a pen register used apart from an author-
ized wiretap. It failed to acknowledge those cases which
held that the combined use of the two devices—the wiretap
and the pen register—is governed by Title III. *E.g., United
States v. Volpe, supra; In re Alperen, supra; United States*

278

*v. Lanza, supra;* Application of the United States for an Order Authorizing the Use of a Pen Register Device, *supra* (*dictum*). The court thus did not perceive the critical distinction between the separate use of a pen register and the employment of such a device as part of a court-supervised wiretap. In consequence, there is no special importance to the passing reference by the Supreme Court in *New York Tel. Co.,* to *Michigan Bell Tel. Co.,* which was cited with several other circuit court decisions merely to exemplify the principle that nonintercepting devices unconnected · with an ongoing wiretap, such as pen registers, are generally not governed by Title III. *United States v. New York Tel. Co., supra,* 434 *U. S.* at 166 n. 9, 98 *S. Ct.* at 369 n. 9, 54 *L. Ed.* 2d at 385–386 n. 9.

Furthermore, the history of the New Jersey amendment is not inconsistent with the interpretation that technical assistance which is supportive of a wiretap includes such non-intercepting devices as pen registers and in-progress traces. The New Jersey Wiretap Act included a termination date of December 31, 1974: *L.* 1968, *c.* 409, § 28. Prior to its termination, Attorney General Hyland had issued a report reviewing the operation of the 1968 law and recommending its re-enactment with certain amendments. *Report on the New Jersey Wiretapping and Electronic Surveillance Control Act, L. 1968, c. 409* (1974). One of the amendments he supported was the inclusion of a section requiring technical assistance in effectuating interceptions. In contrast to the federal technical assistance amendment, however, the Attorney General's proposal contained a specific reference to in-progress traces. *Id.* at 27. Notwithstanding this explicit inclusion of in-progress traces, a form of assistance Bell had been "reluctant to provide", the Attorney General emphasized that the proposed amendment was narrower and stricter than the federal amendment. *Id.* at 26–27.

This technical assistance amendment, along with other amendments proposed by the Attorney General, found its

way into *Senate Bill 1417* (1974), the bill to re-enact the Wiretap Act. Hearings on the bill were held before the Senate Judiciary Committee in January and April 1975. At the January hearing, a Bell representative testified against the technical assistance amendment, informing the committee that Bell had in the past performed and would in the future continue to perform in-progress traces in serious cases such as homicide and kidnapping. *Public Hearing Before the Senate Judiciary Comm. on Senate No.* 1417 at 37A, 40A, 45A (January 30, 1975). He stated, however, that the in-progress trace language of the amendment was objectionable to Bell because it required the company to become an active participant in law enforcement activities and would entail inconvenience for the company. *Id.* at 36A–38A. He urged the committee to strike the words "in-progress trace" from the proposed amendment and to confine the amendment to the language used in the federal law which, in his opinion, did not require technical assistance to perform an in-progress trace. *Id.* at 44A–45A.

Following the hearings, the Judiciary Committee reported *Senate Bill 1417* with important changes in the proposed technical assistance amendment. This section of the bill was almost an exact duplicate of the federal version. All references to in-progress traces were dropped.[3] The committee re-

---

[3]The committee's changes are reflected below, deletions bracketed, additions underscored.

An order authorizing the interception of a wire or oral communication shall, upon [a showing of special need by] *request of* the applicant, direct that a communication common carrier [use its best efforts to] *shall* furnish [forthwith] the applicant [with] *forthwith* all information, facilities and technical assistance necessary to accomplish [an in-progress trace or] *the* interception. [This assistance shall be provided] unobtrusively and with a minimum of interference with the services that such carrier is affording the person whose communications are to be intercepted. [Said order shall limit the hours that the carrier shall be obligated to provide said assistance, and shall specify the circumstances under which an obligation to provide assistance shall arise.] Any communication common carrier

port accompanying the bill made it clear that the language was altered, not to exclude in-progress traces from the ambit of technical assistance, but rather "to conform this provision to the federal law." *Senate Judiciary Comm. Statement to Senate Bill 1417* at 2 (May 19, 1975). This change to the broader, more inclusive language was undoubtedly responsive to the pointed objections raised by law enforcement representatives that the requirements imposed by the Attorney General's initial proposal with respect to technical assistance were too restrictive and unduly burdensome. *Public Hearing Before the Senate Judiciary Comm. on Senate No. 1417* at 33A–35A (April 3, 1975).

There is no extrinsic indication that, in conforming the technical assistance amendment to the federal example, the Senate Judiciary Committee accepted the opinion of Bell's representative that the federal technical assistance amendment did not authorize an in-progress trace in conjunction with a court-supervised wiretap. In fact, at the time of the committee report, the only reported court decisions were those which had recognized that the analogous device, the pen register, could be employed under the federal wiretap law in aid of a wiretap. *In re Alperen, supra; United States v. Lanza, supra; United States v. Falcone, supra;* see *United States v. John, supra; United States v. Brick, supra.*

It is also relevant to note that, as formulated originally by the Attorney General, the proposed technical assistance amendment treated an in-progress trace as the equivalent of the wiretap itself rather than as a subordinate form of technical assistance. Conceivably, this proposal would have compelled a communication common carrier to furnish technical assistance to accomplish not only the wiretap but an in-progress trace as well. *Public Hearing Before the Senate*

furnishing such facilities or technical assistance shall be compensated [for the costs of any assistance rendered to] *therefor by* the applicant *at the prevailing rates.* Said carrier shall be immune from civil liability for any assistance rendered to the applicant pursuant to this section.

*Judiciary Comm. on Senate No. 1417* at 45A (January 30, 1975). The overbreadth of the Attorney General's approach in this respect is highlighted by a recent observation that an in-progress trace is merely a subordinate kind of technical assistance available in aid of an authorized wiretap. See *Electronic Surveillance: Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance* 83–84 (1976) (referring to the decision of the Appellate Division in this case). The National Commission in this report recommended, for purposes of clarity, that more explicit, but not limiting, language might be inserted in the technical assistance provisions of state statutes to obviate recurrent problems of interpretation so that telephone companies could be directed "to furnish all necessary information and assistance to permit accomplishment of a court-authorized wiretap * * *." *Id.* at XV. Its specific proposal in this respect was:

State wiretapping legislation should include a provision directing telephone companies to cooperate with law enforcement in furnishing all necessary assistance to the accomplishment of a court-ordered wiretap, including, but not limited to, prompt cable and pair information, leased lines, pen register or touch-tone decoder aid, and in-progress traces. *Id.* at 10.

In making this recommendation, there was no intimation that current federal and state technical assistance provisions do not already authorize these forms of assistance. The proposal reflects suggestions which had been made to the commission "that the directive provision be amended to clarify the fact that the telephone company can be required to perform inprogress tracing * * *." *Id.* at 84.[4]

---

[4]It may be noted that *Assembly Bill* 1259 (1978), the primary purpose of which is to extend the Wiretap Act beyond its present expiration date of June 30, 1978, would effectuate such a clarification by the inclusion of an amendment providing expressly for an in-progress trace as one form of technical assistance in aid of a wiretap.

It seems, therefore, that in adopting the technical assistance amendment in its present form, the dominant intent of the Legislature was to vest in State law enforcement officers broad and firm authority with respect to obtaining needed technical assistance in conducting wiretap surveillances. This authority was intended to encompass procedures customarily undertaken by a telephone company in connection with a court-ordered wiretap. Those have included furnishing record information concerning the identity and address of telephone subscribers, cable and pair specifications of suspected telephone lines and providing so-called "slave" and leased lines, as well as pen registers, touch-tone decoders and in-progress traces, all of which had been rendered as technical assistance by telephone companies in cooperation with law enforcement authorities. *Id.* at XV, 8-9, 83.

It is anomalous to suggest that a pen register can be used with a wiretap because it assists in accomplishing an interception as a sort of monitoring device, but that an in-progress trace cannot be similarly employed. A pen register performs the same function as an in-progress trace, *i.e.*, identifying the telephone used by another party to a conversation taking place over the tapped telephone. The one device achieves this result by recording sounds or dial tones emanating from the tapped phone while the other traces or follows electrical impulses flowing to the tapped phone. In terms of whether either device can be required as necessary assistance in aid of a wiretap, however, this difference in operation would seem irrelevant and inconsequential.

Moreover, excluding an in-progress trace ancillary to a court-supervised wiretap as a form of technical assistance under the Wiretap Act creates troublesome ramifications. It might be that such a device could then be supplied or withheld solely at the whim of the telephone company if withheld, its use would be wholly beyond the reach of law enforcement personnel, even though needed to supplement and complete an existing lawful wiretap; if, contrariwise, the telephone company deigned to cooperate, the ensuing use of

the in-progress trace would be virtually unregulated. On the other hand, if such assistance could be compelled of the telephone company apart from the Wiretap Act, then presumably authority therefor would have to be extracted from some amorphous, judicial power. It is difficult to conceive, however, that the standards for the exercise of such power, developed on an *ad hoc* basis, could better protect privacy or control and confine the use of such devices than is presently achievable through the comprehensive, exacting and meticulous provisions of the Wiretap Act, which call for judicial superintendence of this activity.

I must conclude, therefore, that an in-progress trace in conjunction with a court-supervised wiretap is a form of technical assistance to be governed by the Wiretap Act. By including devices such as in-progress traces within the ambit of the technical assistance provision the Legislature has, in effect, structured and controlled the furnishing of such assistance within the statutory and judicial framework applicable generally to electronic and wiretap surveillances. It has thus assured that such assistance will be rendered promptly upon a proper and adequately supported request and court order and subjected to the judicial supervision contemplated by the Wiretap Act. It has also eliminated effectively the unevenness and uncertainty which in the past occurred upon the delay or refusal of a communication common carrier to furnish this kind of necessary expert aid. *Electronic Surveillance*: *Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance* at XV, 9, 83. Moreover, it has addressed directly the complaint of the telephone company that it would become too involved in law enforcement investigations and that in some instances it might be inconvenienced in rendering assistance in the form of an in-progress trace. The technical assistance amendment overcomes these concerns and protects a communication common carrier by conferring upon it immunity from civil liability and allowing such a carrier reimbursement for expenses in-

curred in rendering assistance needed to supplement law enforcement efforts. *N. J. S. A.* 2A:156A–12 (f).

The inclusion of in-progress traces as a form of technical assistance in aid of a wiretap under the Wiretap Act thus guarantees that the strict statutory standards designed to protect privacy will be applied while at the same time meeting the needs of law enforcement to counter the threat of modern and sophisticated criminality.

These reasons impel me to dissent from the majority opinion of the Court.

Justice SULLIVAN joins in this opinion.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER—5.

*Dissenting*—Justices SULLIVAN and HANDLER—2.