STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. NICHOLAS CATANIA, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. LOUIS GATTO, JR., DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK P. ELIA, DEFENDANT-APPELLANT.

Argued December 2, 1980—Decided March 16, 1981.

*Priscilla J. Triolo* argued the cause for appellants (*Walsh, Sciuto & Dimin,* attorneys for Nicholas Catania; *William J. DeMarco,* attorney for Louis Gatto, Jr.; *Edward G. O'Byrne,* attorney for Frank P. Elia).

*Robert Rochford,* Deputy Attorney General, argued the cause for respondent (*John J. Degnan,* Attorney General of New Jersey, attorney; *John DeCicco,* Assistant Attorney General, *Daniel Louis Grossman* and *Robert Rochford,* Deputy Attorneys General, of counsel and on the brief).

The opinion of the Court was delivered by

WILENTZ, C. J.

In this case we are called upon to interpret the minimization provision, *N.J.S.A.* 2A:156A–12(f), of New Jersey's Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"). That provision requires those charged with monitoring the wiretap to make reasonable efforts to "minimize or eliminate the interception" of conversations other than those they have been authorized to overhear. This provision plays a crucial role in our overall wiretapping scheme, being one of the few provisions which regulate the conduct of police to protect the privacy of callers during the actual course of the wiretap.

We hold that the police must make reasonable efforts to minimize both "extrinsically," by attempting to limit their hours of interception, and "intrinsically," by attempting to terminate the interception of non-relevant phone calls on an individual basis within the authorized hours of interception. We further hold that, not only must the actual minimization have been reasonable, but the monitoring agents must also have made a good-faith effort to comply with the minimization requirement during the course of the wiretap.

## I.

## FACTS

This case involves two separate wiretaps conducted by the State Police to gather evidence about a suspected bookmaking operation being run over the telephone by Louis Gatto and other persons not involved in this appeal.

The object of the first wiretap was a phone listed to Bert DeWitt of Paterson, New Jersey. That wiretap ran daily from December 4 through December 19, 1979. The wiretap order authorized the police to intercept communications over that phone between the hours of noon and 2:00 p. m. and between 6:00 p. m. and 8:00 p. m., which were deemed to be the peak hours of the bookmaking operation. Louis Gatto was named in the wiretap order as a party whose conversations were to be intercepted.

The second wiretap order authorized the interception of conversations over a telephone listed to the Circle Democratic Club, Lodi, New Jersey. That wiretap commenced on December 15, 1979, and was conducted on a daily basis between the authorized hours of 11:00 a. m. and 8:30 p. m. The wiretap terminated on December 29, 1979, the date on which defendants Nicholas Catania, Louis Gatto and Frank Elia were arrested.

The wiretap facility consisted of two tape recorders, one official and one tandem. The official recorder ran at all times

and recorded every conversation in its entirety. At the end of each shift the official tape was sealed and later duplicated. The speaker of that machine was connected at all times so that every conversation was overheard by the monitoring policemen in its entirety. The tandem recorder was also on at all times, but could be stopped and rewound if it was necessary for the police to review a conversation immediately. The police monitors had the ability not to record or overhear a particular conversation if they so desired, but they had been instructed not to turn off the official machine at any time, no matter how non-relevant the conversation appeared to be. The only exceptions to this policy were privileged conversations such as those between attorney and client or priest and penitent, which they were instructed not to intercept.

When the wiretap was terminated, search warrants were executed and these three defendants arrested. All three moved at various points to suppress the tapes on the ground that the police had failed to minimize properly, as required by *N.J.S.A.* 2A:156A–12(f). Their motions were denied, and they were convicted of various gambling and bookmaking offenses. Their convictions were affirmed by the Appellate Division. We granted certification limited to the question of whether the minimization procedures employed by the police during the course of this wiretap violated *N.J.S.A.* 2A:156A–12(f) or the relevant constitutional provisions. We affirm.

## II.

### STANDING AND WAIVER

Before proceeding to discuss minimization, several questions of standing and waiver must be addressed.

The State has contested the standing of these defendants to challenge this wiretap. According to section 21 of the Wiretap Act, *N.J.S.A.* 2A:156A–21, only an "aggrieved person" may raise the issue of minimization. Section 2(k) of the Act, *N.J.S.A.* 2A:156A–2(k), defines an "aggrieved person" as "a person who was a party to any intercepted wire or oral communication or a

person against whom the interception was directed." Thus, standing has been denied to persons who were not named as targets in a wiretap order and whose conversations were not intercepted during the course of the wiretap. *State v. Barber*, 169 *N.J.Super.* 26, 31–34 (Law Div.1979); *State v. Cocuzza*, 123 *N.J.Super.* 14, 24 (Law Div.1973).

■ Applying this test to the instant case, we find that Cantania is not an "aggrieved person" because he was neither named as a target in the wiretap orders nor was he a party to any of the intercepted conversations. He is thus without standing to contest the minimization procedures employed in these wiretaps.

■ The State concedes that Gatto had standing to contest the first wiretap, because he was named as a target in that order. The State argues, however, that Gatto is without standing to contest the second wiretap, and that Elia is without standing to contest either wiretap, because they were party only to incriminating conversations and not to the non-incriminating conversations that arguably should have been minimized. We decline to accept the State's argument and instead hold that any defendant whose incriminating conversations are intercepted during a wiretap has standing to contest the State's failure to minimize its interception of other non-relevant conversations during the same wiretap, even though that defendant was not a party to those other conversations. Our reasons are several.

■ First, the State's position is that every single interception during the wiretap is a separate search and seizure, its validity therefore to be judged independently of the unreasonableness of other interceptions. The conclusion follows that a person who is party to one interception would be barred from contesting another interception that occurred during the same wiretap. We reject that view. To fragment a wiretap into a series of searches and seizures, rather than viewing it as one continuous search and seizure, would allow the State to intercept innocent conversations illegally and then limit its losses by having the result of only those intrusions suppressed, while keeping the

results of the other interceptions in evidence. In 1975, the Legislature rejected such a fragmented approach to wiretap law in another context when it addressed the question of what remedy should follow a minimization violation. In *State v. Dye*, 60 *N.J.* 518 (1972), we had held that failure by the State to minimize its interception of non-relevant conversations would lead to the suppression of only those conversations, rather than the results of the entire wiretap. 60 *N.J.* at 539–42. The flaw in this approach was that it would not deter the State from disregarding the minimization provision, because only innocent and non-relevant conversations would be suppressed while the relevant ones would remain admissible. The Legislature responded by amending *N.J.S.A.* 2A:156A–21 to provide that any minimization violation would result in the suppression of the "*entire* contents of *all* . . . communications" (emphasis supplied). The Legislature concluded that only by avoiding such a fragmented approach to wiretapping such as that espoused by *Dye* could minimization violations be deterred. *See Senate Judiciary Committee Statement to N.J. Senate Bill No. 1417* (1975), sec. 13. That logic is applicable here. In keeping with this legislative desire for a unitary, rather than a fragmented, approach to wiretapping, we conclude that a *defendant* who was party to at least one conversation, innocent or incriminating, during the course of a wiretap has standing to suppress the entire wiretap results because of the State's failure to minimize its interception of *any* conversations during the course of that wiretap.

Second, a rule which restricted standing to those who were party only to innocent phone conversations would diminish the likelihood that many of the State's minimization procedures would ever be challenged and brought under court scrutiny. Many of the parties to non-incriminating conversations are innocent callers who are not themselves defendants; they cannot bring a pretrial motion to suppress for failure to minimize. Indeed, they may never know their call was tapped. The only persons left to challenge the State's minimization are the defendants themselves, and many of them were party only to

incriminating conversations. If they do not have standing to raise the minimization issue, few persons will be left to raise it. Consequently, the minimization procedures employed by the State would completely escape judicial scrutiny in many cases. It would have little motivation to comply with its minimization obligations. We do not believe that the Legislature intended this result. We therefore conclude that both Gatto and Elia have standing to contest the minimization procedures employed by the State during both of these wiretaps.

The State has further contended that Gatto and Elia waived their right to raise the issue of minimization by failing to make their suppression motion at least ten days prior to trial, as required by *N.J.S.A.* 2A:156A–21. That section requires all suppression motions for failure to minimize to be made at least ten days prior to trial "unless there was no opportunity to make the motion or the moving party was not aware of the grounds for the motion." *N.J.S.A.* 2A:156A–21. Gatto and Elia gave several reasons at trial why they had not moved earlier to suppress for failure to minimize, and the trial judge assured them that their objection was properly made and that they were protected for the record. We conclude from these remarks that he found their delay in raising the objection excusable under *N.J.S.A.* 2A:156A–21. Because we find that there was no minimization violation, we need not pass on the correctness of the trial court's ruling. We take this opportunity, however, to admonish that the ten-day deadline must be adhered to and the exemption given by statute is to be granted sparingly.

We now proceed to consider the challenge to minimization brought by Gatto and Elia.

### III.

### MINIMIZATION

A. *Background of the Minimization Requirement*

The first references to minimization are found in the landmark wiretapping cases of *Berger v. New York*, 388 *U.S.* 41, 87

*S.Ct.* 1873, 18 *L.Ed.*2d 1040 (1967), and *Katz v. United States,* 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.*2d 576 (1967). In *Berger,* the United States Supreme Court struck down New York's eaves-dropping statute, finding that it violated the Fourth Amendment on several grounds. One of these grounds was that the statute permitted "general searches by electronic devices" and allowed conversations to be seized "indiscriminately and without regard to their connection to the crime under investigation." 388 *U.S.* at 59, 87 *S.Ct.* at 1883, 18 *L.Ed.*2d at 1052. The Supreme Court compared such roving eavesdroping warrants to the despised general search warrants which were of primary concern to the framers of the Declaration of Independence and the Fourth Amendment. The Court thus struck down New York's overbroad statute, declaring that electronic surveillance must represent no greater invasion of privacy than "necessary under the circumstances." 388 *U.S.* at 57, 87 *S.Ct.* at 1882, 18 *L.Ed.*2d at 1051.

In *Katz v. United States, supra,* the Supreme Court invalidated an otherwise carefully conducted electronic surveillance operation on the grounds of improper authorization. The Court cited with approval, however, the efforts of the monitoring agents to refrain from listening to non-relevant callers or conversations. 389 *U.S.* at 354, 88 *S.Ct.* at 512, 19 *L.Ed.*2d at 583–84.

When Congress enacted the federal wiretap law, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 *U.S.C.* § 2510 *et seq.,* it responded to *Berger* and *Katz* by including a minimization provision. That provision directs that "electronic surveillance shall be conducted in such a way as to minimize the interception of communications not [related to the crime under investigation]." 18 *U.S.C.* § 2518(5). When New Jersey enacted its Wiretap Act in 1968, it included a similar minimization provision which directed that "[e]very order entered under this section shall require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize *or eliminate* the interception of

conversations not [related to the crime under investigation]." (emphasis supplied).[1] *N.J.S.A.* 2A:156A–12(f). In 1975, the Legislature added a proviso directing that the police fulfill the above minimization obligation "by making reasonable efforts, whenever possible, to reduce the hours of interception authorized by [the wiretap] order." *N.J.S.A.* 2A:156A–12(f).

In addition to being required by statute, minimization is thus necessary to safeguard an important constitutional value: the privacy right of those who use the telephone to be secure from indiscriminate wiretapping that intercepts all conversations, no matter how non-relevant or personal, in violation of the Fourth Amendment proscription against unreasonable searches and seizures.

B.  *Minimization Under Existing New Jersey Law*

There are two basic approaches to minimization, "extrinsic" and "intrinsic." "Extrinsic" minimization is accomplished by simply limiting the hours and total duration of interception, while "intrinsic" minimization is accomplished by terminating the interception of individual phone calls within those hours as it becomes apparent to the monitors that the call is not relevant to the investigation.

New Jersey's Wiretap Act emphasizes extrinsic minimization in its directive that the monitors fulfill their minimization obligation by "making reasonable efforts, whenever possible, to reduce the hours of interception . . . ." *N.J.S.A.* 2A:156A–12(f). This directive was added by a 1975 amendment to the Wiretap Act which effectively codified this Court's decision in *State v. Dye, supra. See Senate Judiciary Committee Statement to N.J. Senate Bill No. 1417* (1975), sec. 8.

---

[1]The language "or eliminate," which was not contained in either the federal statute or most other state wiretap statutes, indicates in our view an intent on the part of the Legislature to make minimization requirements in New Jersey more stringent than those elsewhere. This point is fully discussed *infra* at 437–438.

*Dye*, like the present case, involved the wiretap of an illegal gambling operation. The State applied for and received a wiretap order which limited the period of interception to the hours between 10:00 a. m. and 3:00 p. m., six days a week. During the course of the wiretap, the State recorded and listened to every call made over the facility during the wiretap hours. *Dye, supra,* 60 *N.J.* at 535. The Court found this conduct reasonable and declined to suppress the results of the wiretap.

In finding that extrinsic minimization alone had been sufficient to satisfy the State's minimization obligations, the Court cited the difficulties inherent in ascertaining whether any given phone call will turn to criminal matters. It expressed the fear that participants in criminal conspiracies would take advantage of a rule requiring intrinsic minimization by prefacing their criminal conversations with innocuous small talk and later, after the agents had ceased monitoring the conversation, turning their discussion to criminal matters. *Dye, supra,* 60 *N.J.* at 538. The Court thus refused to adopt an "ironclad" rule requiring intrinsic minimization, holding instead that extrinsic minimization alone had been enough to fulfill the State's obligations in that case. *Id.*

Opinion within New Jersey was not, however, unanimous as to the desirability of a rule not requiring intrinsic minimization. In a case preceding *Dye, State v. Molinaro,* 117 *N.J.Super.* 276 (Law Div.1971), rev'd on other grounds, 122 *N.J.Super* 181 (App.Div.1973), Justice Handler, then a Superior Court judge, invalidated the fruits of a wiretap where the police had failed to minimize intrinsically their interception of patently irrelevant phone conversations within the authorized hours of interception. He concluded that the statute's unequivocal mandate to "minimize or eliminate" the interception of nonsubject communications required minimization to be conducted on an intrinsic, call-by-call basis. *Molinaro, supra,* 117 *N.J.Super.* at 285. He observed that "[i]t should not be thought a remarkable attribute of an officer's authority in conducting a wiretap that he be

discriminate, discerning and sensitive to communications which do not in any way relate to criminal activities or would not assist in the apprehension of criminal suspects." *Id.* at 292. Because the police had "intentionally opted to defy [the minimization] requirement by purposefully including in their interceptions every conversation uttered regardless of its investigative worth," Judge Handler deemed it "patent that they have violated the command of the statute." *Id.* at 293.

Nevertheless, *Dye* has continued to be the controlling case on minimization in New Jersey. We believe the time has now come to reassess the soundness of *Dye*'s failure to require intrinsic as well as extrinsic minimization.

## C. *Future Minimization Standard for New Jersey*

*Dye* was decided at a time when there was little law in the area of minimization and when wiretapping as a recognized tool of law enforcement was relatively new. Subsequent developments both in the law and in law enforcement have rendered *Dye*'s approval of solely extrinsic minimization increasingly questionable. Both federal and state courts since *Dye* have avoided adopting a purely extrinsic approach to minimization, but have either explicitly or implicitly required intrinsic minimization. *See, e. g., United States v. Clerkley*, 556 F.2d 709, 716 (4th Cir. 1977), *cert.* den., 436 *U.S.* 930, 98 *S.Ct.* 2830, 56 *L.Ed.*2d 775 (1978); *United States v. Hinton*, 543 F.2d 1002, 1011–12 (2d Cir.), *cert.* den., 429 *U.S.* 980, 97 *S.Ct.* 493, 50 *L.Ed.* 2d 589 (1976); *United States v. Kirk*, 534 F.2d 1262, 1275 (8th Cir. 1976), *cert.* den., 430 *U.S.* 906, 97 *S.Ct.* 1174, 51 *L.Ed.*2d 581 (1977); *United States v. Turner*, 528 F.2d 143, 156–58 (9th Cir.), *cert.* den., 429 *U.S.* 837, 97 *S.Ct.* 105, 50 *L.Ed.*2d 103 (1975); *United States v. Armocida*, 515 F.2d 29, 44 (3d Cir.), *cert.* den., 423 *U.S.* 858, 96 *S.Ct.* 111, 46 *L.Ed.*2d 84 (1975); *United States v. Quintana*, 508 F.2d 867, 874–75 (7th Cir. 1975); *People v. Floyd*, 41 *N.Y.*2d 245, 251, 360 *N.E.*2d 935, 941, 392 *N.Y.S.*2d 257, 262 (1976); *Spease v. State*, 275 *Md.* 88, 338 *A.*2d 284, 291 (1975); *Commonwealth v. Vitello*, 367 *Mass.* 224, 327 *N.E.*2d 819, 842

(1975); *Rodriguez v. State*, 297 *So.*2d 15, 21 (Fla.1974). This has led one commentator to note that, with the exception of New Jersey, every jurisdiction in his study had embraced an intrinsic minimization approach. Fishman, "The Minimization Requirement in Electronic Surveillance: Title III, The Fourth Amendment, and the Dread *Scott* Decision," 28 *Am.U.L.Rev.* 315, 345 n. 179 (1979).

This trend in the law has cast increasing doubt upon our premise in *Dye* that intrinsic minimization is impractical. Moreover, the constitutionality of a purely extrinsic approach to minimization has been rendered questionable by the United States Supreme Court's opinion in *Scott v. United States*, 436 *U.S.* 128, 98 *S.Ct.* 1717, 56 *L.Ed.*2d 168 (1978).

In *Scott*, the Supreme Court addressed the question of what minimization efforts are required by the federal minimization provision, which the Court deemed to be coterminous with the Fourth Amendment. Implicit throughout the *Scott* opinion is the assumption that minimization is to be conducted intrinsically on a call-by-call basis.

The wiretap in *Scott* was being conducted to gather evidence concerning a major narcotics conspiracy. During the month that the wiretap was in progress, the police listened to every single call even though only 40 percent of the calls turned out to be relevant to the investigation. The agents admitted that they had made no attempt to minimize their interception of non-relevant phone calls. The Supreme Court nevertheless found their conduct reasonable.

The Supreme Court first concluded that the subjective intent of the agents not to minimize was irrelevant. The Court instead held that all the Fourth Amendment required was that the minimization procedures have been *objectively* reasonable based on the circumstances confronting the officers at the time. 436 *U.S.* at 136, 98 *S.Ct.* at 1722, 56 *L.Ed.*2d at 177.

In determining that the minimization efforts were objectively reasonable, the Supreme Court articulated several guidelines

that should guide the courts of this State as well in their determination of reasonableness. First, the police are not expected to terminate the interception of all non-relevant phone calls. This would demand a prescience on their part that is humanly impossible. Rather, what is required is that they make reasonable efforts to minimize or eliminate their interception of such calls. Because of "the necessarily ad hoc nature of any determination of reasonableness," the sufficiency of minimization efforts must be judged on a case-by-case basis. 436 *U.S.* at 139–40, 98 *S.Ct.* at 1724, 56 *L.Ed.*2d at 179.

Also, in assessing the objective reasonableness of the monitors' actions, courts should avoid "blind reliance" on numbers and percentages alone. There may be many situations where high percentages of non-relevant calls are intercepted yet the minimization efforts are nevertheless reasonable. 436 *U.S.* at 140, 98 *S.Ct.* at 1724, 56 *L.Ed.*2d at 179. According to *Scott*, there are three basic factors to be considered in assessing the reasonableness of the monitors' minimization efforts.

The first factor is the nature of the individual phone calls, which may make them difficult to minimize. Some calls may be short and the conversation might end before the monitor has had a chance to determine their relevance. Others may be one time only calls, in which case the monitors may have no chance to determine whether a particular caller is linked to the conspiracy. Often calls may be ambiguous and guarded, or employ cryptic language, and their full relevance cannot be ascertained until later in the investigation. 436 *U.S.* at 140, 98 *S.Ct.* at 1724, 56 *L.Ed.*2d at 179.

Second, the purpose of the wiretap is often a key consideration. When the police are investigating a conspiracy, more extensive surveillance is justified to determine the full scope of the enterprise. Also, where the telephone is being used to transact illegal business, as it was in the case before us, closer surveillance may be called for. 436 *U.S.* at 140, 98 *S.Ct.* at 1724, 56 *L.Ed.*2d at 179.

Finally, the reasonable expectation of the agents as to what they would overhear based on the information available to them at the time of the wiretap is an important consideration. Early in the wiretap investigation, the agents may have to intercept all but the most patently innocent phone calls in order to establish patterns of relevant and non-relevant calls. Also, otherwise innocent phone calls may yield valuable information about the movements of a suspect or transactions in which he is about to engage. Once patterns of relevant and non-relevant phone calls and callers have been established, and gaps in the agents' knowledge of the conspiracy have been filled in, the agents are less justified in intercepting calls that seem to fall within the non-relevant category. 436 *U.S.* at 141, 98 *S.Ct.* at 1725, 56 *L.Ed.*2d at 180.

Thus, in deciding whether the minimization efforts employed by the police during the course of the *Scott* wiretap satisfied the Fourth Amendment, the Supreme Court focused exclusively on the nature of the individual calls and determined whether it was reasonable for the monitors to listen to each call. Such an approach makes it evident that intrinsic minimization, on a call-by-call basis, is necessary to make a wiretap reasonable under the Fourth Amendment.

■ Although *Dye* approved of an extrinsic approach to minimization under the circumstances of that case, it did not altogether foreclose the possibility that intrinsic minimization would be required under other circumstances. *Scott* has since established that such an approach is necessary to comply with the Fourth Amendment. We therefore modify and extend the rule in *Dye* to hold that the police must make reasonable efforts to minimize intrinsically as well as extrinsically. The reasonableness of their intrinsic minimization will be judged by the three factors delineated in *Scott*.

■ Applying the *Scott* criteria to the instant wiretap, we hold that the wiretap was objectively reasonable for Fourth Amendment purposes.

First, the nature of most of the non-relevant phone calls made them difficult to minimize. Almost all of these calls were less than a minute in duration and their relevance could not have been ascertained before the call ended. No pattern emerged as to either non-incriminating conversations, of which there were relatively few, or non-relevant callers. Significantly, the defendants have not pointed to a single non-relevant conversation that was unreasonably intercepted.

Second, the fact that this wiretap involved a gambling conspiracy justified broad interception during the authorized hours of surveillance. Such surveillance was necessary in order to determine the full scope of the conspiracy and the identities of its participants. The conspiracy in this case spanned two counties, encompassed many types of gambling, and involved 11 defendants. The broad nature of the gambling operation justified correspondingly broad interception by the monitors.

The final consideration is the reasonable expectation of the agents as to what they would overhear based on the information available to them at the time. In this case the phones, one of which was located in a basement coal bin, were being used almost exclusively to carry on gambling. Once the State had limited its hours of surveillance to peak bookmaking hours, during which an overwhelming percentage of the calls were gambling-related, it had every reason to believe that any given call would pertain to gambling. The statistical analysis produced by the State supports this contention. During the first wiretap, over 90 percent of the calls were incriminating. As for the second wiretap, over 60 percent of the calls were incriminating. We thus conclude that, based on the information available to them at the time, it was reasonable for the police to intercept every phone call unless it became obvious that a particular call did not relate to gambling.

Thus, the minimization procedures employed in the instant case were *objectively* reasonable under the criteria set forth in *Scott*. The wiretap was therefore in full compliance with the

Fourth Amendment. The failure of the police to make a *subjective,* good-faith effort to minimize, intrinsically, however, raises important questions which will be discussed in the following section.

D. *The Subjective Good-Faith Requirement*

In contesting the State's minimization efforts, the defendants argue that section 12(f) was violated by the State's policy of not making any effort to minimize intrinsically, no matter how innocuous and irrelevant a particular call might appear to be.[2] This raises the question of whether the police must make a good-faith effort to minimize intrinsically.

For the reasons to be discussed, we hold that subjective good faith will be required in addition to actual objective reasonableness in all minimization efforts.

In *Scott v. United States, supra,* 436 *U.S.* at 136, 98 *S.Ct.* at 1722, 56 *L.Ed.*2d at 177, the United States Supreme Court concluded that the Fourth Amendment did not require monitors to make good faith efforts to minimize. Although we have based the intrinsic minimization requirement on the Fourth Amendment rather than section 12(f) of the Wiretap Act, we nevertheless find that section relevant to the issue of subjective good faith. For the following reasons, we conclude that section 12(f) provides an independent basis for a good-faith requirement.

A state may enact wiretap laws that give its citizens greater protection than does the federal wiretap law, and courts may construe their own state's wiretap law so as to afford their citizens additional protection. *State v Barber, supra,* 169 *N.J. Super.* at 30; *State v. Sidoti,* 116 *N.J.Super.* 70, 77–78 (Law Div.1971), rev'd on other grounds, 120 *N.J.Super.* 208 (App.Div. 1972). *See also United States v. Marion,* 535 *F.*2d 697, 702 (2d

[2]The only exception to this policy, as stated earlier, involved privileged conversations. *See supra* at 424.

Cir. 1976); *State v. Ayers*, 118 *N.H.* 90, 383 *A.2d* 87, 88 (Sup.Ct. 1978); *Wilks v. Commonwealth*, 217 *Va.* 885, 234 *S.E.2d* 250, 251 (Sup.Ct.1978); *Warden v. Kahn*, 99 *Cal.App.3d* 805, 160 *Cal.Rptr.* 471, 474 (Ct.App.1979); *State v. Guhl*, 140 *Ga.App.* 23, 230 *S.E.2d* 22, 25–26 (Ct.App.1976).

■ The courts of this State have historically given a strict construction to the New Jersey Wiretap Act. By the time *Dye* was decided, several lower court decisions had noted the strict approach taken by the Legislature toward wiretapping and had interpreted the Act accordingly. *See, e. g., State v. Molinaro, supra; State v. Sidoti, supra,* 116 *N.J.Super.* 70, 77–78 (Law Div. 1971), rev'd. on other grounds, 120 *N.J.Super.* 208 (App.Div.1972); *State v. Christy,* 112 *N.J.Super.* 48 (Law Div.1970). In several recent decisions, this Court has strictly construed the Wiretap Act so as to afford maximum safeguards for individual privacy. *See State v. Cerbo,* 78 *N.J.* 595 (1979) (holding that a violation of the sealing provision would result in suppression of the tapes in question); *In re Wire Communication,* 76 *N.J.* 255 (1978) (holding that an in-progress trace of incoming phone calls violated the Wiretap Act). The above decisions illustrate a firm and longstanding principle in this State that the Wiretap Act, "implicating as [it does] an intrusion into individual rights of privacy, constitutionally and legislatively recognized, should generally be strictly construed." *In re Wire Communication, supra,* 76 *N.J.* at 260.

■ In addition to this principle, a comparison of New Jersey's minimization provision with the federal provision convinces us that the Legislature intended to lay down stricter minimization guidelines than did Congress. While the federal act only directs monitors to "minimize" their interception of non-relevant communications, 18 *U.S.C.* 2518(5), section 12(f) of our Act directs them to "minimize *or eliminate*" the interception of such communications (emphasis added). The addition of the language "or eliminate" is evidence of a legislative intent to make New Jersey's minimization provision even more stringent than its

federal counterpart. *Molinaro, supra,* 117 *N.J.Super.* at 286. *See also* Note, "New Jersey Electronic Surveillance Act," 26 *Rutgers L.Rev.* 617, 632–33 (1973). Further on in section 12(f), where the Legislature codified *Dye* by emphasizing extrinsic minimization, the statute directs the police to make "reasonable efforts" to comply with that standard. The federal minimization provision contains no such language. The inclusion of that language in section 12(f) indicates a legislative intent to focus on the agent's efforts at the time, rather than just to view them from objective hindsight. Although the command to exercise "reasonable efforts" refers to the agent's extrinsic minimization efforts; this part of the statute was enacted shortly after *Dye*, at a time when extrinsic minimization appeared sufficient to satisfy the State's minimization obligation. Now that intrinsic minimization is also required, we believe that the Legislature would have intended that the police exercise good-faith "reasonable efforts" in complying with that obligation as well. Indeed, it would be anomalous to conclude that subjective good faith was required for extrinsic minimization but not for intrinsic minimization.

The above differences in language, together with the principle favoring strict construction of wiretap statutes, persuade us that section 12(f) should be construed so as to require subjective good faith as well as objective reasonableness in all police minimization procedures.

This conclusion is further supported by an examination of the rest of the Act, which is replete with sections in which the Legislature laid down stricter wiretapping guidelines than did Congress. One illustrative section is *N.J.S.A.* 2A:156A–11, which requires the State to show a "special need" before it can wiretap a public phone or the phone of an attorney, physician, practicing psychologist, clergyman, newspaperman, or spouse. *See State v. Sidoti, supra,* 116 *N.J.Super.* at 77–78. New Jersey also requires a more detailed showing of probable cause where the person or telephone facility was the target of a previous wiretap, and it directs the judge to make certain *in camera*

inquiries where probable cause for the wiretap consists of an informant's uncorroborated word. *N.J.S.A.* 2A:156A–10(f). New Jersey has also reduced the maximum initial authorization period to 20 days from the 30 days allowed by federal law. *N.J.S.A.* 2A:156A–12(f). Finally, New Jersey has enacted a more severe remedy than has Congress for failure to minimize. *N.J.S.A.* 2A:156A–21, as amended in 1975, requires that a minimization violation will result in the suppression of *all* conversations intercepted during the wiretap. *N.J.S.A.* 2A:156A–21. Federal law, however, is still unsettled on this point. *See Scott v. United States, supra,* 436 *U.S.* at 135 n. 10, 98 *S.Ct.* at 1722 n. 10, 56 *L.Ed.*2d at 176 n. 10. This amendment is particularly significant because it specifically overruled this Court's holding in *Dye* that failure to minimize properly would result in the suppression of only specific non-relevant conversations. The amendment thus manifests an unequivocal legislative intent to regulate wiretapping as strictly as possible. *See Senate Judiciary Committee Statement to N. J. Senate Bill No. 1417,* sec. 13 (1975). *See also State v. Molinaro, supra,* 117 *N.J.Super.* at 294–95.

Therefore, we conclude that section 12(f) of the New Jersey Wiretap Act provides a sufficient independent foundation upon which to base a good-faith requirement. We will now discuss the policy considerations favoring adoption of such a requirement.

At the outset, we note that a good-faith requirement is hardly a novel idea in minimization law. Prior to *Scott,* numerous cases had required agents to make good-faith efforts to minimize, *see, e. g., United States v. Turner, supra,* 528 *F.*2d at 156; *United States v. Armocida, supra,* 515 *F.*2d at 53; *United States v. Manfredi,* 488 *F.*2d 588, 599 (2d Cir. 1973), *cert.* den., 417 *U.S.* 936, 94 *S.Ct.* 2651, 41 *L.Ed.*2d 240 (1974); *People v. Floyd, supra,* 41 *N.Y.*2d at 251, 360 *N.E.*2d at 941, 392 *N.Y.S.*2d at 262; *Commonwealth v. Vitello, supra,* 367 *Mass.* 224, 327 *N.E.*2d at 842 n. 22; *Rodriguez v. State, supra,* 297 *So.*2d at 21, and no cases had expressly rejected such a requirement. Also, at least

one state case since *Scott* has continued to require good faith on the basis of its own state wiretap statute. *People v. Calogero*, 75 *A.D.*2d 455, 429 *N.Y.S.*2d 970, 974 (App.Div.1980). We find compelling reasons for incorporating such a requirement into New Jersey wiretap law.

Electronic surveillance represents a greater threat to individual privacy than do traditional searches and seizures. The latter represent the culmination of a long investigation process, and are accompanied by a search warrant that particularizes the areas to be searched. A wiretap, on the other hand, is itself a major investigative tool. Unless the police take great care to minimize, they will overhear not only the particularized conversations they are "searching" for, but private conversations unrelated to the search. This invades the privacy of both the person who is the target of the wiretap, and that of innocent callers whose most personal conversations are being overheard by the wiretap monitors. Such pervasive intrusions were unknown under traditional search and seizure law, and the traditional safeguards provided by that law are inadequate in the context of a wiretap. All reasonable safeguards, such as a good-faith requirement, are necessary. *See* Fishman, *supra*, 28 *Am.U.L. Rev.* at 335; Note, "The Requirement of Minimization Under Section 2518(5) of Title III of the Omnibus Crime Control and Safe Streets Act of 1968," 26 *Wayne L.Rev.* 239, 256 (1979).

Increased protection for the privacy of those using the telephone is particularly necessary in New Jersey, with its heavy emphasis on wiretapping as a tool of law enforcement. Ever since 1969, when the federal and New Jersey wiretap acts became law, New Jersey state wiretaps have accounted for 24.08 percent of all federal and state wiretaps that have been issued

nationwide. This trend seems likely to continue.[3] This emphasis on wiretapping is not in itself necessarily pernicious. It may, on the contrary, attest to the vigorous and efficient efforts exerted by our law enforcement authorities in ferreting out crime and investigative leads.

However, the need for intrinsic minimization in fact, as well as a good-faith attempt to effect it, is based more on our sense of the nature and potential expansion of this intrusion than on statistical evidence of its present pervasiveness. While New Jersey's taps are high in relation to other jurisdictions, the total

---

[3]New Jersey's heavy reliance on wiretapping is illustrated by the following table:

| | No. of Orders Entered in N.J. (State Courts Alone) | No. of Orders Entered Nationwide (Both State & Federal) | N.J. Percentage of Nationwide Total |
|---|---|---|---|
| 1979 | 151 | 553 | 27.3 |
| 1978 | 151 | 570 | 26.5 |
| 1977 | 152 | 626 | 24.3 |
| 1976 | 167 | 686 | 24.3 |
| 1975 | 188 | 701 | 26.8 |
| 1974 | 138 | 728 | 19.0 |
| 1973 | 220 | 864 | 25.5 |
| 1972 | 228 | 855 | 26.7 |
| 1971 | 178 | 816 | 21.8 |
| 1970 | 137 | 596 | 23.0 |
| 1969 | 47 | 301 | 15.6 |
| Totals ... | 1,757 | 7,296 | 24.08 |

The figures for New Jersey were obtained from the annual reports from the Chief Justice and the Attorney General to the Governor and the Legislature, which are submitted each year pursuant to *N.J.S.A.* 2A:156A–23(e). The nationwide figures were obtained from the Annual Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral

number do not suggest any threat of massive invasion of privacy. There is, however, something about the nature of this "search and seizure" that makes it more frightening today than the traditional ones. One may find himself an innocent bystander on premises that are subjected to a reasonable search; it may be upsetting, but his mere presence should not lead to a search. If it does it probably will not lead to any significant revelation of private matters; at the very least he knows of the occurrence. With a telephone tap, it's quite different. It is not at all unusual for a call to contain a significant portion that is private for business or personal reasons, its privacy very often important to the callers. A tap of that call is a direct invasion of their privacy, and an inevitable one. The innocent caller is, in effect, searched; he is no mere bystander. Perhaps worst of all, he will rarely know that the tap has taken place, what information was revealed, to whom it was revealed and to whom it may have been repeated. The law in some instances permits the repetition even of innocent conversations that are overheard. The statute, perhaps sensibly, does not attempt to undo the damage by requiring notice to the innocent callers of the interception. *See N.J.S.A.* 2A:156A–16 (innocent callers need only be notified when the judge, in his discretion, determines such notification to be in the interests of justice). Presumably the Legislature felt that the risks of disclosure would be increased, rather than diminished, by any such procedures.

The greatest possible protection, consistent with legitimate law enforcement, is needed here. Both the technology and its use are likely to expand—including a tap that will *show* the callers. Ordinary people may increasingly wonder which of their private conversations are known to strangers and what strangers; and increasingly embarrassment may result. This is an undisclosed, usually never known, theft of liberty and privacy. It is ugly by nature, and potentially much more dangerous

---

Communications, which is submitted annually to Congress by the federal Administrative Office of the Courts.

than the statistics indicate. We therefore conclude that heightened safeguards are called for.

We do not believe that a *post hoc*, objective approach to minimization is sufficient to deal with the magnitude of this intrusion. First, a purely objective approach tempts the monitoring officer to intercept non-relevant conversations indiscriminately and then devise after-the-fact rationalizations for these interceptions. Because the criteria used in evaluating the objective reasonableness of minimization procedures are necessarily broad, there are almost no interceptions so outrageous that *some* later rationalization cannot be devised for them. A subjective good-faith requirement, on the other hand, would examine intentions of and efforts made by the monitoring officer *at the time* to comply with his minimization duties and bring these under closer scrutiny. It would also motivate agents to employ minimization procedures that are sufficiently conscientious to withstand an inquiry into subjective good faith.

Second, a solely objective, *post hoc* analysis invites courts to devise after-the-fact rationalizations for inadequate minimization. A judge who is confronted with reels of incriminating conversations, as well as generalized rationalizations given by the State for its conduct, is under pressure to find the minimization procedures reasonable. This result contravenes the basic Fourth Amendment principle that a search cannot be justified by its fruits. Fishman, *supra*, 26 *Am.U.L.Rev.* at 334–35; Note, "Minimizing Minimization," 59 *B.U.L.Rev.* 567, 574–75 (1979); Note, 53 *Tul.L.Rev.* 264, 270–71 (1978).

One difficulty with a good-faith requirement is the uncertainty involved in measuring an agent's subjective good faith. Courts must often infer good faith from a person's actions. Thus, in some cases a finding of good faith will automatically follow a finding that the agent's minimization actions were reasonable. However, there is additional objective evidence a court may examine to determine whether an agent acted in good faith. Written minimization instructions may have been distrib-

uted to all of the monitors at the outset of the wiretap. The monitors may have compiled lists of non-pertinent categories of calls and callers as the wiretap progressed. More important, the actual termination of non-pertinent calls is always evidence of good faith. Conversely, full interception of lengthy conversations that were highly personal and clearly irrelevant would be evidence of bad faith. In short, while good faith cannot always be measured with precision, it may be inferred from objective evidence such as that suggested above.

▆▆▆▆▆▆ Turning to the instant case, we find that the police acted in good faith. It is true that they did not make any attempt to minimize intrinsically, with the exception of privileged conversations. However, our opinion in *Dye*, reinforced by the language of *N.J.S.A.* 2A:156A–12(f), had assured them that extrinsic minimization was all that was required of them. Of their good faith in minimizing extrinsically there can be no doubt. The first wiretap ran only four hours a day, and the second wiretap ran only for nine and a half hours a day. Moreover, on several days when there was little gambling activity, the police further minimized extrinsically by terminating the wiretap early. Because the State Police made a good-faith effort to comply with what was then the law, the present wiretap will not fail for lack of good faith.[4] However, because

---

[4]Although we have applied the intrinsic minimization requirement to this case (and found it satisfied), we have limited the good-faith requirement in this case to extrinsic minimization. While new rules of law are almost invariably applied to the case in which they are announced, the result in this case is justified where the good-faith requirement is being applied to an obligation (intrinsic minimization) that did not exist at the time of the wiretap. Analytically, this limitation of the good-faith requirement to extrinsic minimization can be explained by defining the requirement as mandating good faith only with respect to those procedures required at the time of the tap, *i. e.*, extrinsic minimization. In any event, whatever good is served by the usual application of the new rule to the case at hand would be more than offset here by imposing an anomalous requirement that police officers should have made a good-faith effort to discharge a duty that was unknown to them at the time in question.

we hold today that intrinsic as well as extrinsic minimization is required in the future, monitoring agents must make good-faith efforts to minimize intrinsically as well as extrinsically.

### E. *Practical Considerations*

We do not believe that the minimization guidelines set forth today will present any significant difficulty for law enforcement officials in conducting electronic surveillance. *See Molinaro, supra,* 117 *N.J.Super.* at 289–93.

Some fear that an intrinsic minimization requirement is impractical, and that it will force monitors to terminate prematurely their interception of phone calls which begin on an innocent note but later turn to discussions of criminal activity. We do not think such results are necessary under our approach to intrinsic minimization. This approach takes into account the fact that monitors are not prophets, and thus they are not expected to anticipate and screen out all non-relevant phone calls. All they are expected to do is make reasonable efforts to identify innocent, non-relevant phone calls and minimize their interception.

As noted earlier, virtually every other jurisdiction requires its monitors to minimize intrinsically. This does not appear to have impeded the ability of authorities in those jurisdictions to utilize electronic surveillance effectively in pursuit of their law enforcement objectives. Moreover, we know that intrinsic minimization can be done in New Jersey because it has been done in New Jersey. The Essex County Prosecutor's Office has for years been minimizing intrinsically as well as extrinsically, and we see no sign that their conscientious procedures have frustrated effective law enforcement in that county. *See State v. Molinaro, supra,* 117 *N.J.Super.* at 290. On the contrary, in *State v. Burstein,* 85 *N.J.* 394, 414–416 (1980), we today upheld the reasonableness of an Essex County wiretap in which intrinsic minimization was employed, although highly personal conversations were intermixed with frequent references to criminal activity.

Finally, wiretap technology makes it possible to minimize intrinsically without losing important criminal conversations in the process. One solution is "spot monitoring," a technique whereby the monitoring agent stops listening to a conversation if, after a short while, it appears to be irrelevant. However, rather than terminating the interception indefinitely, the agent continues to tune in periodically to see if the conversation has turned to criminal matters. If it has, then he resumes full interception. Spot monitoring would protect the privacy of innocent callers without providing a loophole through which criminals could avoid detection by prefacing their conversations with innocent small talk. *See* Fishman, *supra,* 28 *Am.U.L.Rev.* at 327–28. Moreover, spot monitoring is highly persuasive evidence of a good-faith intention on the part of the monitors to minimize. It should be noted that we only include this technique as a suggestion; the police are free to adopt other means of fulfilling their obligation to minimize intrinsically.

Intrinsic minimization admittedly puts some pressure on law enforcement officials to make some difficult snap judgments in determining whether an incoming phone call is relevant or not. However, as pointed out in *State v. Molinaro, supra,* 117 *N.J.Super.* at 291–92, officers frequently exercise such judgment in a wide variety of situations which require at least as sensitive an exercise of discretion as does intrinsic minimization.

## IV.

### RETROACTIVITY

Finally, we hold that this decision should be applied only to minimization procedures conducted after today. It is to be given neither complete retroactive effect, which would make it applicable even to past cases that have exhausted all avenues of direct review, nor limited retroactive effect, which would make it applicable only to cases that have not exhausted all avenues of direct review as of the date of the decision.

In deciding not to apply this holding retroactively, we rely on the three-pronged test established in *State v. Nash*, 64 *N.J.* 464 (1974), and subsequently reaffirmed in *State v. Howery*, 80 *N.J.* 563, *cert.* den., 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.2d* 424 (1979), and *State v. Carpentieri*, 82 *N.J.* 546 (1980). That test looks to: (1) the purpose of the new rule and whether it would be furthered by retroactive application; (2) the reliance placed on the old rule by those charged with administering it; and (3) the effect that retroactive application would have on the administration of justice. All three factors disfavor retroactive application here.

As to the purpose of the new rule, the rule in this case excluding the results of a wiretap because of improper minimization is an exclusionary rule. As our previous cases hold, the deterrent purposes of such a rule are not furthered by retroactive application. *Carpentieri, supra*, 82 *N.J.* at 549; *Howery, supra*, 80 *N.J.* at 569.

As for reliance on the old rule, the police may have justifiably relied on both the language of *N.J.S.A.* 2A:156A–12(f) and our decision in *Dye, supra*, in their decision to minimize extrinsically but not intrinsically. Such justifiable reliance should not be punished by retroactive application of the rule established here. *See Carpentieri, supra*, 82 *N.J.* at 549; *Howery, supra*, 80 *N.J.* at 569.

Finally, the effect of retroactive application on the effective administration of justice could be chaotic. Law enforcement bodies such as the State Police have been minimizing extrinsically but not intrinsically for years. To reopen those cases, even on a limited basis, for detailed hearings on the reasonableness of the interception of each phone call during each wiretap would certainly overwhelm our courts.

Although this is not a necessary consideration in resolving the retroactivity question, it is nevertheless worth noting that today's result will not offend the imperative of judicial integrity. That concept favors the suppression of unlawfully obtained

evidence in certain situations so that the integrity of the judicial process will not be tarnished. Judicial integrity does not, however, require the suppression of evidence where, as in this case, the police reasonably believed in good faith that their conduct was lawful. *State v. Howery, supra,* 80 *N.J.* at 579 (Pashman, J., dissenting).

Therefore we decline to give any retroactive application to today's decision.

## V.

## CONCLUSION

For the reasons stated above, we hold that the police must make reasonable efforts to minimize intrinsically as well as extrinsically. We believe this result is required by the Fourth Amendment, and we therefore extend the rule of *State v. Dye, supra,* to require intrinsic as well as extrinsic minimization.

In addition, we hold that the police must make a subjective good-faith effort to comply with this minimization obligation. Objective reasonableness, from a *post hoc* viewpoint, is not enough. This result is required by section 12(f) of the Wiretap Act.

Our review of the wiretap in the instant case satisfies us that both the reasonableness and the good-faith requirements were complied with.

The judgment of the Appellate Division is therefore affirmed.

PASHMAN, J., concurring and dissenting in part.

For the reasons I have stated previously in *State v. Carpentieri,* 82 *N.J.* 546, 556 (1980) (Pashman, J., dissenting), and *State v. Howery,* 80 *N.J.* 563, 575 (Pashman, J., dissenting), *cert.* denied, 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.*2d 424 (1979), I believe that the minimization standards established today in this case should be applied retroactively to cases pending direct review in our courts. I agree with the majority, however, that

these standards were not violated by the police conduct in this case.  Accordingly, I vote with the majority to affirm the convictions of these defendants.

PASHMAN, J., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER, and POLLOCK—7.

*For reversal*—None.